**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| KIMBERLY M. GARDNER,<br><br>              Plaintiff,<br><br>     v.<br><br>CITY OF ST. LOUIS; THE ST. LOUIS POLICE OFFICERS ASSOCIATION, FRATERNAL ORDER OF POLICE LODGE 68; JEFFREY ROORDA; GERARD CARMODY; PATRICK CARMODY; RYANN CARMODY; and CHARLES LANE,<br><br>              Defendants. | Civ. Action No. 4:20-cv-00060<br><br>Jury Trial Demanded |

## AMENDED COMPLAINT

NOW COMES Plaintiff Kimberly M. Gardner, by her attorneys, and for her amended complaint against the above-named Defendants, states as follows:

## INTRODUCTION

1.      This is an action to redress violations of the Ku Klux Klan Act and the Fourth and Fourteenth Amendments to the United States Constitution.  The civil rights conspiracy statute, now codified at 42 U.S.C. § 1985, was passed as part of the Ku Klux Klan Act.

2.      When Congress debated the Ku Klux Klan Act in 1871, its House sponsor, Rep. Samuel Shellabarger of Ohio, explained that the legislation's purpose was "the prevention of deprivations which shall attack the equality of rights of American citizens."  Cong. Globe, 42d Cong., 1st Sess. 478 (1871).

3.      In describing the amendment that ultimately became section 1985, Rep. Shellabarger explained that "any violation of the right, the *animus* and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, shall be within the scope of the remedies of this section." *Id.*

4.      An important original purpose of Section 1985 was to allow for federal judicial enforcement of the Fourteenth Amendment to curb conspiracies of white citizens who sought to interfere with state authorities' efforts to expand racial justice and equality in the former Confederacy.

5.      Plaintiff Kimberly Gardner is the first African American Circuit Attorney in the history of St. Louis, Missouri.

6.      Sadly, the City of St. Louis has a long history of racial inequality and prejudice in its criminal justice system generally, and within its police force particularly.  It is no slight to the dedication of hundreds of thousands of fine police officers nationwide to note that there are far too many tragic cases of lawless police misconduct with far too little accountability.  Residents of the St. Louis area have known this brand of suffering more intimately than most in recent years.

7.      Gardner was elected in 2016 on a promise to redress the scourge of historical inequality and rebuild trust in the criminal justice system among communities of color.

8.      Unfortunately, entrenched interests in St. Louis, including Defendants, have mobilized to thwart these efforts through a broad campaign of collusive conduct, including the unprecedented appointment of a white, ethically conflicted Special Prosecutor to investigate the activities of Gardner's office and a patently overbroad and unconstitutional ransacking of the office's electronic files.

9.      The Defendants leveraged their control of the Special Prosecutor's office to set up many of the trappings of a legitimate criminal investigation, complete with subpoenas and a grand jury.  But the true purpose of Defendants' conduct is not to charge Gardner with any crime—because they know that she has not committed any.  Rather, it is to thwart and impede her efforts to establish equal treatment under law for *all* St. Louis citizens at every turn; to remove her from the position to which she was duly elected—by any means necessary—and perhaps to show her successor what happens to Circuit Attorneys who dare to stand up for the equal rights of racial minorities in St. Louis.

10.      The United States Congress passed the Ku Klux Klan Act during the aftermath of the Civil War to address precisely this scenario: a racially-motivated conspiracy to deny the civil rights of racial minorities by obstructing a government official's efforts to ensure equal justice under law for all.

11.      The stakes are high.  This case cries out for federal enforcement.

### THE PARTIES

12.      Plaintiff Kimberly M. Gardner is the duly elected Circuit Attorney for the City of St. Louis.  In that role, she functions as the chief prosecutor for the City of St. Louis and as the head of Circuit Attorney's Office.  Pursuant to section 56.450 of the Revised Statutes of Missouri, the Circuit Attorney is charged with managing and conducting "all criminal cases, business, and proceedings of which the circuit court of the city of St. Louis shall have jurisdiction."  Gardner was elected in November 2016 and took office on January 6, 2017.  She is the first African American ever to be elected as the chief prosecutor for the City of St. Louis.  Gardner does not purport to brings this action on behalf of the City of St. Louis, rather she brings this action on behalf of herself as an individual.

13.     Defendant City of St. Louis (the "City") is a municipal corporation.  On September 1, 2013, following the passage of legislation establishing local control over law enforcement rather than state control, the City created its own police force.  Consequently, the St. Louis Metropolitan Police Department, which previously operated under authority of state law and the control of a state-appointed Police Board, became an internal department of the City known as the Police Division.  The City's chief legal counsel, City Counselor Julian Bush, represents the Police Division in court.

14.     Defendant St. Louis Police Officers Association, Fraternal Order of Police Lodge 68 (the "SLPOA"), is a labor union that comprises and represents many members of the Police Division of the City of St. Louis.

15.     Defendant Jeffrey Roorda is the executive director and business manager of the SLPOA.  He is a former Arnold, Missouri police officer who was fired for making false statements and false reports.  Roorda is sued in his individual capacity.

16.     Defendant Gerard T. Carmody ("Carmody") is a Principal in the St. Louis law firm Carmody MacDonald P.C.  On June 29, 2018, at the request of the City (on behalf of the Police Division), Judge Michael K. Mullen of the Missouri Circuit Court for the Twenty-Second Judicial Circuit appointed Carmody as Special Prosecutor to investigate potential charges in connection with the invasion of privacy case brought against former Missouri Governor Eric Greitens.  Carmody has claimed that even though he wields the power of a Special Prosecutor, he is "not a 'public governmental body' as defined in § 610.010 RSMo and therefore am not subject to an open records request under the Missouri Sunshine Law."  Carmody is sued in his individual capacity.

17. Defendant Patrick Carmody is an attorney and the son of Defendant Gerard T. Carmody. Patrick Carmody has assisted in the Special Prosecutor's investigation of Gardner, including by personally participating in the execution of a search warrant at her office. He is sued in his individual capacity.

18. Defendant Ryann Carmody is an attorney and the daughter of Defendant Gerard T. Carmody. Ryann Carmody has assisted in the Special Prosecutor's investigation of Gardner, including by substantially participating in matters related to the search warrant that was executed at Gardner's office. She is sued in her individual capacity.

19. Defendant Charles Lane is a Caucasian former Police Division Officer. Lane has brought a civil action against Gardner intending to prevent her from protecting the interests all of the people of St. Louis. Lane is sued in his individual capacity.

## JURISDICTION AND VENUE

20. This action arises under the Constitution and laws of the United States, specifically 42 U.S.C. §§ 1983 and 1985, and the Fourth and Fourteenth Amendments to the United States Constitution. This Court has original jurisdiction over the claims asserted in this Amended Complaint pursuant to 28 U.S.C. §§ 1331 and 1343(a).

21. Venue in the Eastern District of Missouri is proper under 28 U.S.C. § 1391(b) because all Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims herein took place within this district.

## FACTUAL ALLEGATIONS

I. **The History of Invidious Racial Animus Within the City, Its Police Division, and the SLPOA**

22. Of St. Louis's approximately 300,000 residents, approximately 46% are black and 48% are white.

23.     Yet, as of December 31, 2018, approximately 66% of officers in the Police Division were white, 30% were black, and 4% were of any other race.  Beyond the Chief, white officers are significantly overrepresented in managerial and commander positions and in specialized units of the Police Division where assignments are considered especially desirable.

24.     According to data from the Missouri State Attorney General, blacks are over-represented in the number of traffic stops by the Police Division and whites are under-represented. In 2016, blacks were 85% more likely to be stopped by the Police Division than whites. In 2017, that number was 97%, and in 2018, it was nearly 120%.

25.     According to a 2016 report issued by the St. Louis Ethical Society of Police ("ESOP"), in 2012, nearly twice as many African Americans as Caucasians were stopped by police in St. Louis, while more than three times as many African Americans were searched by police.  Comparable or worse disparities persisted in 2013 (African Americans accounted for 68% of stops and 80% of searches), 2014 (66% of stops and 77% of searches), 2015 (64% of stops and 72% of searches).

26.     In each of these years, African Americans were significantly more likely to be stopped, searched, and arrested than Caucasian residents, but were significantly *less* likely to be found with contraband.

27.     In 2015, about 75% of adults arrested in the City were African American, while around 25% were Caucasian—despite the approximately equal demographic split in the City's population.

28.     In 2018, of those arrested for FBI Part II Crimes (less serious) in St. Louis, 75.2% were Black and 24.6% were white.

29.     ESOP's 2016 report also detailed, at great length, numerous examples of disparate disciplinary treatment within the Police Division — for example, black officers are punished much more severely for minor infractions than white officers are punished for major cases of police misconduct.

30.     Throughout this period, explicit expressions of racial animus were prevalent within the membership of the Police Division and the SLPOA and ignored or condoned by their leadership.

31.     On information and belief and based on recent media reports, there are white supremacists on the St. Louis police force.

32.     In 2019, the Plain View Project, a research project created to identify public Facebook posts and comments by police officers that could erode civilian trust and confidence in law enforcement, revealed that a number of St. Louis officers had posted racist and offensive content on social media over a period of years.  In total, the Plain View Project identified approximately 420 such posts by current and former Police Division officers.[1]

33.     For example, Mike Mosier is a retired Police Division officer and former active SLPOA member who more recently served as the St. Louis Police Veterans Association's Sergeant-at-Arms.  Mosier, who is Facebook friends with Defendant Roorda, repeatedly authored posts and comments on Facebook expressing xenophobic and racist views and condoning or encouraging police violence, including:

    a.  Commenting "Goode Ole Memories and War stories, LOTS of stories !" on another Police Division officer's post that included the statement

---

[1] All posts quoted herein are reproduced as originally written without corrections for errors in spelling and grammar.

"Protecting and Serving The Shit out of You," together with a diagram of two police officers beating someone with batons (around 7/21/13);

b. Sharing a photograph of three Muslim women wearing American flag hijabs that is captioned "I find this offensive" (11/30/15);

c. Posting an "I [image of heart] Being White" meme (12/2/15);

d. Sharing a post that states that black anti-racism demonstrators "managed to . . . live up to the ghetto stereotypes" (8/18/16);

e. Commenting on a photograph of a Muslim road maintenance worker posted by another former Police Division officer: "Makes aiming the car easier !!" (2/25/17).

34.    On August 31, 2014, a former Police Division officer posted a photograph on Facebook of an African American police officer standing with two African American demonstrators, calling the officer "Captain 'Hug a Thug'" and "a disgrace to the uniform." Jerry Foster, a Police Division Lieutenant, posted a comment on the photograph stating: "as an active Police Commander with 27 years law enforcement experience, I couldn't agree with you more."

35.    In 2015, in response to a post by former police officer Thomas Mabrey regarding Muslims, taken from "Round Up And Deport Every Illegal Alien In the USA," Lieutenant Foster sarcastically responded, "But we should trust them and let more in the country. People better wake up." More recently, in May of 2018, Lt. Foster allegedly posted the following statement: "I'm not sure what the hell is going on in our country these days. I just drove by an authentic Mexican restaurant in town; and there were white guys putting on a new roof, cutting the grass and doing landscaping."

36.     Roger Murphey, a Police Division officer who is Facebook friends with Defendant Roorda and is, upon information and belief, a member of the SLPOA, posted on Facebook on September 15, 2017 that people demonstrating against police racism were "protesting for a violent thug by breaking the law" and that "kimmy G [Gardner]" was "backing them."  Another Police Division officer responded: "Another George Soros/Black Lies Matter production. . brought to you by spine-less politicians and fake clergy. . starring paid thugs and deluded libturds. .in order to further Soros' agenda to defeat America and it's patriots."

37.     Scott Weidler, a Police Division Sergeant and, upon information and belief, a member of the SLPOA, also repeatedly made social media posts expressing racist attitudes and condoning police violence.  For example, on December 7, 2014, Weidler posted a photograph of an apparently Latino man wearing a sombrero with the word "Mexico" painted on it, with the following words superimposed over it: "Mexican word of the day: Nissan.  When me and my lady have sex on the floor, I always burn my Nissan the carpet."

38.     Jonathan Carroll, a Police Division officer who is, upon information and belief, a member of the SLPOA, likewise repeatedly made offensive and racist posts online, including:

a.  Posting "Its nice to see a assbag that runs from the police to get wat he deserves" (5/31/14);

b.  Sharing a photo that decries that "a forced invasion of illegal aliens are now arriving here expecting everything for free" (7/16/14); and

c.  Posting a photograph of soldiers dropping paper leaflets from an aircraft with the caption: "Air dropping job applications will disperse the rioters faster than tear gas" (11/18/14).

39.     Thomas Mabrey, a St. Louis police officer from approximately 1989 until December 2019, also posted numerous racist and aggressively hostile statements on social media, including:

a.   Sharing a link to a blog post referring to Black History Month as "Annual Bash America Month" (2/7/14);

b.   Sharing multiple links to posts decrying the supposed failure of "race hustlers" and "race baiters" to condemn violent crimes carried out by African Americans against white victims (9/6/14 and 10/11/14);

c.   Posting a photo that states that: "It was black people who sold other black people into slavery and the first slave owner in America was black. All the ghettos in America are run by Democrats and more white people are shot and killed by cops than are black people. Last time I checked, it was black people looting their own businesses and killing their own people. So tell me again who needs to start taking responsibility for their actions" (6/28/15);

d.   Posting a link to an article entitled "If You Wipe Your Butt With Your Bare Hand But Consider Bacon To Be Unclean, You may be a Muslim" (10/11/15);

e.   Claiming that "'White Privilege' is a myth perpetuated by those who hate white people" (6/30/16);

f.   Posting a meme exclaiming: "proud to be a [image of cracker]" (6/30/16);

g.   Sharing memes that compare anti-racism demonstrators to the Ku Klux Klan (7/10/16, 7/24/16); and

h. Repeatedly posting memes asserting that adult Muslim men marry children.

40.    Ronald E. Hasty, a former Police Division Sergeant and, upon information and belief, a member of the SLPOA, prolifically posted white nationalist propaganda on social media, including:

a. Sharing a meme asserting that anti-racism demonstrators had "managed to . . . live up to the ghetto stereotypes" and imploring demonstrators to "start acting like civilized Americans" (3/21/15);

b. Repeatedly posting photographs of the Confederate flag that include incendiary commentary asserting, among other things, that "we will not back down from our heritage" and "If this flag offends you, you need a history lesson" (6/26/15);

c. Posting a meme with a photograph of an apparently Latino man wearing a large sombrero, superimposed with the text: "Mexican word of the day: Cheater. I ate so many beans last night that I was on the cheater all daylong" (3/16/16);

d. Sharing a meme stating, "March is National Stop Blaming White People Month! Accept responsibility for your own bad choices. Hug a white person!" (1/21/16);

e. Sharing an article about controversial "kettling" tactics used by St. Louis police against demonstrators with the original poster's commentary, which states: "I personally loved seeing this and I don't care if people were

roughed up. When the police tell u to do something u do it. It's called respecting authority. U play u pay. Bottom line" (9/21/17); and

     f.   Sharing a post stating: "If the Confederate flag is racist, then so is Black History Month" (9/28/17).

41.    In addition to the examples set forth above, the Plain View Project identified at least 23 other St. Louis officers who had *publicly* posted racist and offensive content on Facebook. One such post advocated that African Americans found an independent country where "they can have their own taxes . . . and pay their own welfare . . . . Oooooppps, small problem here, they might have to work for a living, oh well scrap that idea." Another offered to sell a t-shirt emblazoned with the words, "Black Lives Splatter, because Blue lives matter."

42.    Defendant Roorda remains Facebook "friends" with at least seven officers whose posts were unearthed by the Plain View Project.

43.    Upon information and belief, Defendant Roorda was aware of these racist and offensive posts.

44.    Upon information and belief, neither SLPOA nor the Police Division took any action against the vast majority of the members or officers who have made racist or offensive posts, promulgated any policies, or instituted any training or discipline to address prevalent racism within their ranks of which they were or should have been aware.

## II.    SLPOA has gone out of its way to support white officers accused of perpetrating acts of violence and excessive force against African American citizens.

45.    On August 9, 2014, Ferguson, Missouri police officer Darren Wilson shot and killed 18-year-old Michael Brown. Wilson is white, and Brown was black. The incident touched off months of unrest in Ferguson, a city less than 10 miles from St. Louis, and elsewhere. The U.S. Department of Justice investigated the incident and Ferguson Police

department.  The Department of Justice concluded that that the evidence did not support charging Wilson with a violation of federal law, but also found that that "many officers appear to see some residents, especially those who live in Ferguson's predominantly African American neighborhoods, less as constituents to be protected than as potential offenders and sources of revenue . . . . The result is a pattern of stops without reasonable suspicion and arrests without probable cause in violation of the Fourth Amendment; infringement on free expression, as well as retaliation for protected expression, in violation of the First Amendment; and excessive force in violation of the Fourth Amendment."

46.     Defendant Roorda has written two books in which he characterizes public concerns about Brown's death and policing in Ferguson as part of a "War on Police."  Roorda was an ardent supporter and defender of Darren Wilson, and publicly wore an armband that read, "I am Darren Wilson."

47.     SLPOA paid the bail of Jason Stockley, a white officer who shot and killed an African American motorist named Anthony Lamar Smith in December 2011.  According to a later report by ESOP, Stockley was in possession of an assault rifle that was not authorized by the police department, and the in-car camera captured him saying to his fellow officer, "Going to kill this mother fucker, don't you know it."  After a chase ended with the deployment of Smith's airbag, Stockley exited his vehicle, walked to Smith's vehicle, raised Smith's airbag, and shot Smith several times.  Stockley claimed he acted in self-defense, but the handgun which a gloved Stockley allegedly recovered from Smith's car contained Stockley's DNA and none of Smith's.

48.     On September 15, 2017, after a bench trial, a St. Louis Circuit Court Judge acquitted Stockley.  In his opinion, the Circuit Judge made the claim about Smith that "based on [his] nearly thirty years on the bench, [ ] an urban heroin dealer not in possession of a firearm

would be an anomaly." In addition, the Circuit Judge dismissed Stockley's statement "we're killing this motherfucker" as "ambiguous depending on the context."

49.     The acquittal touched off a wave of demonstrations. During the demonstrations, three officers on the Police Division's "Civil Disobedience Team" exchanged text messages gleefully anticipating the opportunity to "whoop some ass," with one writing: "It's gonna get IGNORANT tonight!! But it's gonna be a lot of fun beating the hell out of these shitheads once the sun goes down and nobody can tell us apart!!!!"

50.     One of the officers' victims was an African American detective named Luther Hall, who was thrown to the ground and savagely beaten.

51.     SLPOA has provided legal representation at least 4 Police Division officers—all SLPOA members—who were indicted by the United States Department of Justice in connection with the Hall beating. One of those officers, Randy Hays, pled guilty to violating Hall's civil rights, admitting that he and his colleagues saw Hall standing in the street—doing nothing criminal or suspicious—and threw him to the ground and beat him because they believed he was a protester.

52.     Joseph "Joe" Marcantano, an active member of SLPOA and former member of its Executive Board, is alleged to have witnessed the beating of Hall and failed to intervene to stop it. Three months after the Hall beating, the City promoted Marcantano to Sergeant.

### III.     Defendants' Resistance to Gardner's Attempts to Improve Fairness in the St. Louis Criminal Justice System

53.     In 2016, with issues of police violence still prominent in public discourse, Gardner successfully campaigned for election as the Circuit Attorney for the City of St. Louis. She promised voters she would work to rebuild trust in the criminal justice system.

54.     As Gardner told *The St. Louis American*, a leading voice of the St. Louis area's African American community, in 2016: "Criminal justice system statistics suggest and too many Americans feel our system is unfair.  This lack of faith, and the resulting skepticism in communities of color, have devastating consequences.  It makes the job of holding those accountable who commit violent and serious crime difficult by lowering the levels of cooperation with law enforcement, prosecutors, and courts in many of our communities."

55.     Gardner further explained: "By virtually every criminal statistic – arrest rates, sentencing, victims of police use of excessive force – communities of color are disproportionately over-represented.  This being a large part of the history of many communities of color, there exists a large, prevailing mistrust of the criminal justice system . . . .  The experiences of many white Americans with law enforcement, prosecutors and the courts are significantly different from the experiences of many African Americans."

56.     Since being elected, Gardner has taken a number of steps to improve fairness in St. Louis's criminal justice system and increase trust in the system among communities of color.

57.     Among other reforms, Gardner has created and deployed the most prosecutor-led diversion programs of any office in the state; refused to prosecute cases involving possession of small amounts of marijuana; closed over 30,000 open cases that had been assigned the status "Taken Under Advisement" that were impeding putative defendants' employment opportunities and negatively affecting criminal background checks despite having no likelihood of prosecution; led a number of complex investigations against police and public corruption; created a conviction integrity unit; significantly increased victim and witness protection services; established a pilot program with St. Louis's public school system to break the school-to-prison

pipeline; significantly decreased the use of pretrial detention in favor of increased reliance on summonses; and implemented implicit bias training.

58.     One of the centerpieces of Gardner's bold plan to achieve racial justice and equality in the St. Louis criminal legal system was to institute a protocol for independent investigations of officer-involved shootings.

59.     Police control of officer-involved shooting investigations are a recognized factor in the under-prosecution of police violence. Police officers are often reluctant to testify against fellow officers, or even provide investigators with any evidence, leading to what is known as "the blue wall of silence." Officers who do cooperate with investigators risk alienation or retaliation.

60.     Perhaps unsurprisingly, the Police Division remains extremely unreliable when it comes to investigating its own police misconduct. For example, on June 21, 2017, a white St. Louis Police Division officer shot an off-duty black officer who was attempting to help during an arrest. In a police statement, it was claimed that the white officer was "fearing for his safety" at the time he shot the black officer. There was no explanation for this fear, and none of the other officers on the scene saw any need to shoot the black officer. On information and belief, this investigation is still open.

61.     On or about October 3, 2017, in the wake of Stockley's acquittal, Gardner announced a proposal to hire five investigators, four prosecutors, and two support staff to create an independent team to investigate all police-involved shootings. This new team, independent of the Police Division, would replace the Police Division's own overwhelmingly white "Force Investigation Unit," which was formed in 2014. Published reports suggested that there were at least 25 shootings under investigation at the time of Gardner's proposal.

62.     The SLPOA expressed "serious concerns" about Gardner's proposal for independent investigation of police shootings and insisted that such shootings should continue to be investigated by the Police Division's own Force Investigation Unit.  In March 2018, Gardner's proposal was procedurally killed by the Public Safety Committee of the Board of Alderman, due in significant part to the SLPOA's opposition.

63.     The SLPOA, Roorda, and the Police Division have continued to oppose Gardner's reform efforts at every turn.

64.     For example, on August 31, 2018, Gardner announced that her office would no longer accept criminal cases from 28 St. Louis police officers because the Circuit Attorney's Office determined that it could no longer rely on the veracity of the officers.  Defendant Roorda criticized the creation of this exclusion list on behalf of the SLPOA, calling it "dangerous." State and federal prosecutors across the country maintain similar lists across the country, and prosecutors are constitutionally required to disclose impeachment information contained on such lists to defendants and their counsel.

65.     On January 30, 2019, the Circuit Attorney's Office charged Police Division Officers William Olsten and Joseph Schmitt with first-degree assault and armed criminal action and Schmitt also with unlawful use of a weapon for the off-duty assault of a civilian.  Schmitt shot the civilian multiple times.  On June 12, 2019, Defendant Roorda made the following statement:

> The St. Louis Police Officers Association proudly stands behind our members in their time of need.  We are hosting the fundraiser free of charge as we do for the members of our organization all of the time.  We are not the least bit concerned about the criminal charges pending against Officer Olsten.  The only criminal involved in that case is Kim Gardner, who wrongly charged Officer Olsten and Officer Schmitt for acting in self-defense against a would be cop killer.

**IV.    Defendants' Attempts to Intimidate, Silence, and Sideline Gardner to Prevent Her from Carrying Out Her Duty to Provide Equal Protection of the Law to All**

66.    In early 2018, as Defendants' efforts to resist Gardner's agenda of reform and police accountability reached a fever pitch, news broke that then-Governor Eric Greitens had been accused of taking illicit photographs of a sexual partner against her will.  On or about January 11, 2018, the Circuit Attorney's Office opened an investigation.

67.    After the Police Division, FBI and U.S. Attorney refused to provide investigative support, Gardner hired former FBI agent William Don Tisaby, an African American former FBI agent, Air Force veteran and private investigator, to assist in the investigation.

68.    On or about March 19, 2018, Greitens's counsel deposed Mr. Tisaby about his interview of Greitens's alleged victim.  Greitens's defense team was led by Edward L. Dowd, Jr.

69.    On May 15, 2018, Dowd issued a statement claiming that Greitens's team would be filing a police report accusing Tisaby of committing perjury during his deposition.

70.    On that same day, the Police Division announced that it would be opening an investigation into the allegations against Mr. Tisaby.

71.    Around this time, Gardner began receiving threatening letters filled with racial invective at her office.  Another letter, received on or about May 16, 2018, called Gardner a "crooked, lying, NIGGER Cunt" and a "lowlife NIGGER BITCH" and demanded that she resign.  On or around May 18, 2018, another letter arrived calling Gardner a "dumb shit burr head" and a "dumb nigger bitch" and claimed her "problem is white people, threatening "you're not going to beat these white boys."  Another such letter, received on or about June 29, 2019, called Gardner "incompitent [sic] and a racist," accused her of being "a handicap to police," directed her to "go away forever," and threatened that "[i]f you don't leave something will be done about you."  Gardner reported these letters to the Police Division and, on information and

belief, they did not investigate these potential threats to an elected official, even though at least one of the letters had a name and return address on it.

72.     On June 7, 2018, the Police Division, through the City Counselor's Office, formally asked the Circuit Court for an order appointing a Special Prosecutor to investigate allegations of perjury against Tisaby. The Police Division's motion states that it needed "an impartial prosecuting attorney to evaluate and request investigative subpoenas as part of the Police Division's investigation of the above-referenced alleged criminal conduct involving the circuit attorney's office."

73.     Oral argument on the motion was held on June 27, 2018, before Circuit Court Judge Michael K. Mullen. As a result of representations made by the City, Judge Mullen denied Gardner's request for an evidentiary hearing, despite the fact that the Police Division's motion had been unverified and there was literally no evidence before the Circuit Court.

74.     Two days after oral argument, on June 29, 2018, the Court granted the Police Division's motion and appointed Defendant Gerard Carmody as the Special Prosecutor. The appointment was exceedingly unusual. While it is relatively common for Missouri prosecutors to address conflicts of interest by appointing fellow prosecutors from other jurisdictions, appointing a lawyer from private practice is highly irregular. Carmody's appointment was particularly unusual because his practice was focused almost entirely on commercial real estate and civil litigation.

75.     The order appointing Gerard Carmody as Special Prosecutor authorized him to draw upon the resources of his law firm, Carmody MacDonald P.C. Despite a Missouri constitutional provision banning nepotism in government appointments, Gerard Carmody named his daughter and son, Ryann C. Carmody and Patrick G. Carmody, to assist him.

76. While Carmody's appointment would be a surprising idea even if the Court or one of the parties had raised it for discussion at a hearing, the idea of appointing Carmody was *never* raised before the Court. Indeed, the first time Gardner so much as heard of or read Carmody's name as a potential appointee was when she read it in Judge Mullen's appointment order. Prior to the release of the order appointing Carmody, there had been no discussion of the question of appointing a lawyer from private practice, no discussion of Carmody's qualifications, and no discussion of Carmody's potential conflicts.

77. Had such a discussion occurred, it would have revealed that:

a. Carmody and Dowd are lifelong friends going back to their days graduating in the same class of 1967 and playing on the same sports teams at Chaminade College Preparatory School in St. Louis ("Chaminade"), from which Judge Mullen also graduated.

b. A number of children and other relatives of Carmody, Dowd and Judge Mullen graduated from or currently attend Chaminade where Carmody serves on the Board of Trustees.

c. Carmody and Dowd are former partners in the Bryan Cave law firm.

d. Judge Mullen is Facebook friends with Ryann Carmody, Patrick Carmody, Defendant Roorda, Mary Pat Carl (a candidate who ran against Gardner in 2016), and other relatives of those working against Gardner's reform agenda.

e. Ryann Carmody acknowledged the closeness between her father and Dowd, and how it could be seen as a conflict with respect to Dowd's

representation of Greitens, in a text message to a Circuit Attorney's Office employee.

f.   Dowd supported Carmody's candidacy to serve on the Appellate Judicial Commission that recommends Missouri's appellate and supreme court justices. Carmody served on the Commission from 1999 to 2005.

g.   Carmody donated $500 to Patrick Hammacher's campaign when he was running against Gardner in the 2016 race for Circuit Attorney. Patrick Carmody gave $50 to the same campaign against Gardner.

h.   Carmody and Dowd have jointly represented the same party in litigation at least five times. In at least three additional cases, Carmody and Dowd represented co-defendants. In at least four additional cases, their law firms have represented co-defendants.

i.   Patrick Carmody is a member of Young Friends of the BackStoppers, an organization with close ties to the Police Division and SLPOA. Young Friends of the BackStoppers is closely affiliated with the BackStoppers, an organization that Dowd once headed and on whose Board of Directors he remains to this day.

j.   Dowd made political contributions to Roorda's political campaigns in 2018 and 2015.

k.   In 2008, Carmody and Dowd co-hosted a political fundraiser where the guest of honor was then St. Louis County Prosecutor Bob McCulloch, who some later accused of skewing the Michael Brown investigation in favor of Darren Wilson.

78.     Carmody and his children have profited significantly from his appointment as Special Counselor.  As of August 2019, the people of St. Louis had already paid Carmody and his law firm just under $400,000 for his work as Special Prosecutor.

79.     Although Gardner has attempted to raise concerns about Carmody's conflicts of interest and filed pleadings and scheduled a hearing at which the conflicts issue would be heard, Carmody repeatedly sought and received delays of any hearing concerning his conflicts after Judge Mullen told Carmody that the media might attend a hearing on the conflicts. Subsequently, there has never been a hearing on this issue.

80.     The more than 50-year relationship between Carmody and Dowd is exponentially closer and more problematic than the approximately four-month contractual relationship between Gardner and the Circuit Attorney's ex-private investigator, Mr. Tisaby—an ex-private investigator in a concluded case.

81.      The unfairness of Carmody's close relationship with Dowd goes beyond the fact that the Special Prosecutor's very close friend was essentially the complainant in the very matter under investigation.  As the Police Division knew at the time, members of the Dowd Bennett law firm had told Gardner in March 2018 that they would "ruin" her, "personally and professionally," unless she dismissed the charges against Greitens.  They repeated their threats in April 2018.  This made the appointment of Dowd's close friend and former law partner wildly unfair.  The lack of notice and lack of any evidentiary hearing prevented this information from coming to light in a timely way.

82.     Gardner reported the threats from the Greitens legal team to the Police Division in early June 2018.  However, in contrast to its swift opening of an investigation into Dowd's complaint against Gardner, the Police Division sat on the report for months without any

discernible action. Eventually in late 2019, Gardner's allegations were referred to a Special Prosecutor—yet another private lawyer with a close relationship to Dowd's law firm, rather than a serving elected prosecutor in a neighboring jurisdiction. After a cursory investigation, using the Police Division as his investigators, that Special Prosecutor declined to pursue charges against those who had threatened Gardner.

### V. Defendants' Unconstitutional Search and Seizure of the Circuit Attorney's Investigative Files and Cooptation of the Grand Jury Process

83. As Special Prosecutor, Defendant Gerard Carmody has abused his authority.

84. On January 24, 2019, Carmody issued a first search warrant to the Circuit Attorney's Office. The Circuit Attorney's Office produced documents responsive to the first warrant—which requested all of Mr. Tisaby's correspondence—on February 4, 2019.

85. Less than three weeks later, on February 21, 2019, Carmody sought a second search warrant. This second warrant sweepingly requested electronic communications and files containing any one of thirty-one incredibly broad search terms, including "[n]otes," "[b]ullet [p]oints," and "[v]ideo," without any limiting nexus to Tisaby or the Greitens case. The second search warrant called for any document containing those search terms, so long as it was *stored*— not created—on the Circuit Attorney's Office's server between January 1, 2018 and June 30, 2018, which had the effect of expanding the universe of requested documents far into the past, covering many open police investigations but without any conceivable tie to Tisaby or Greitens.

86. The second search warrant, by its terms, allowed any "law enforcement personnel, or other individuals assisting law enforcement personnel" to execute the warrant and conduct the search. Such expansive language means that Carmody could share what was found with anyone "assisting" the effort, regardless of whether such person has been vetted for conflict of interest,

safety, security, and privacy concerns, and regardless of whether that person has been duly appointed as part of the Special Prosecutor's investigation.

87.     It is unclear who requested the second search warrant.  Carmody has represented that the Police Division applied for the second search warrant, while the Police Division has represented that Carmody, in his role as Special Prosecutor, was responsible for requesting the warrant.

88.     Counsel for Gardner and the Circuit Attorney's Office contacted Carmody on February 27, 2019 to point out that "[e]xecuting that search warrant, particularly without agreed-upon safeguards in place, would greatly jeopardize confidential, sensitive information that could put the public at risk as well as jeopardize ongoing investigations and prosecutions" and to request a meeting prior to execution of the search warrant.  Carmody first refused to have any such discussion, and then claimed that the only way to comply with his search warrant was to turn over every document and not claim any privilege.

89.     As the Special Prosecutor's investigation gathered steam, Defendants SLPOA and Roorda used racist and slanderous rhetoric to advance the improper purposes of the investigation and foment animus against Gardner.

90.     For instance, on March 11, 2019, SLPOA posted an event on its Facebook page entitled "Kim Gardner Hypocrisy-palooza," accusing her of refusing to cooperate with the Special Prosecutor's investigation.  To illustrate the event, SLPOA used a black-and-white photograph of two white police officers with two snarling police dogs in a 1960 Ford police car, evoking police use of dogs to attack African Americans during the civil rights movement.

91.     On March 26, 2019, Roorda posted the following on SLPOA's Facebook page: "GARDNER's GUIDE TO OBSTRUCTING JUSTICE IN 10 EASY (ILLEGAL) STEPS:

Unbelievable!!! How the St. Louis media gets away with continuing to ignore Kim Gardner's obstruction of justice in the Special Prosecutor/Special Grand Jury investigation of criminal conduct by her office is a case of journalistic malpractice. SOOOOOO, read it hear first! I only pasted in the first two pages of the Special Prosecutor's reply brief (you can read the whole thing on Casenet) but it is a scathing plaint of unethical and/or unlawful conduct that Gardner herself engaged in and continues to engage in. IF she doesn't get indicted for suborning perjury (575.040 & 562.014 RSMo) and/or interference with legal process (575.160 RSMo) and/or concealing an offense (575.020 RSMo) and/or obstructing government operations (576.030), I'll eat my hat!"

92.     On April 29, 2019, immediately following extensive briefing over the constitutionality of the second search warrant, and prior to receiving Judge Mullen's order, approximately ten to fifteen officers from the Police Division entered the Circuit Attorney's Office to execute the search warrant. Among other things, they threatened to kick in the door to the IT room, forced a CAO employee to provide passwords to the CAO's entire computer system, videotaped numerous other passwords, and physically took the server containing every email for every employee of the CAO, including the most obviously privileged emails—emails between the Circuit Attorney and her outside counsel for the investigation being done by Carmody. Contrary to the law prohibiting prosecutors from being present for searches, Ryann Carmody and Patrick Carmody were present at times during execution of the warrant.

93.     As of the date on which Carmody and the Police Division took possession, custody, or control of all the information on the servers of the Circuit Attorney's Office, the Circuit Attorney was investigating approximately 40 cases of alleged police misconduct, including approximately 25 incidents in which people in the City of St. Louis claim either to

have been shot by police officers or to have been subjected to some other kind of excessive force. The CAO's investigative files therefore contain highly sensitive information, such as the health and financial information of witnesses, subjects, and targets of grand jury investigations.

94.     On information and belief, all files seized pursuant to the overbroad search warrant Carmody obtained remain in the possession, custody, and control of Carmody and the Police Division. Ryann Carmody told the Circuit Attorney's Office that Carmody did not need the server anymore because he had "mirrored" it. This includes, without limitation, all files on the server in which police officers were under investigation for police misconduct. The Police Division returned the server on July 25, 2019.

95.     Carmody made clear that he would not even create a taint team to prevent the wide dissemination of privileged and sensitive information.

96.     In his role as Special Prosecutor, Carmody also convened a grand jury for the ostensible purpose of investigating whether Mr. Tisaby, the ex-investigator for the prosecution in the since-dismissed Greitens matter, committed perjury.

97.     On information and belief, the grand jury was impermissibly gerrymandered, which resulted in a significantly larger number of Caucasian grand jurors than African American grand jurors.

98.     In another example of how Carmody misused his position as Special Prosecutor to fish for information to prevent Gardner from doing her job, during his grand jury investigation, Carmody deceptively presented a document as a valid out-of-state subpoena to an out-of-state business in order to get information outside of the scope of the authority given him as the Special Prosecutor.

99.     In April 2019, Carmody subpoenaed then-Chief Investigator and Special Assistant Circuit Attorney Anthony Box.  During his grand jury testimony, Mr. Box was several times unconstitutionally denied access to his attorney by Special Prosecutor Gerard and Ryann Carmody, who subjected Mr. Box to hostile, oppressive, and intentionally confusing questioning and improperly inquired about privileged conversations Mr. Box had with his attorney.

100.    In or about April 2019, retired St. Louis Police Department Officer Charles Lane filed a taxpayer lawsuit against Gardner to prevent her from performing the contracts that she entered into to compensate the attorneys representing her with respect to Defendant Gerard T. Carmody's investigation.  On information and belief, Lane is a member of the SLPOA.  Lane lived down the street from Dowd when they were both younger.  Lane believes he donated to Hammacher's campaign against Gardner.  Lane is presently involved in a separate lawsuit where he is working with the City Counselor's Office.  In a sworn deposition, Lane admitted that "there are no facts in [his] Verified Motion for Temporary Restraining Order that [he] know[s] are true."  Despite the fact that Gardner followed the same protocol of the prior Circuit Attorney, City Counselor Bush has sided with Lane against Gardner in Lane's lawsuit.

101.    On June 14, 2019, the Special Prosecutor's Grand Jury indicted Tisaby on six counts of perjury and one count of tampering with physical evidence.

102.    The Tisaby indictment is not in the usual form for a Missouri indictment.  Almost every Missouri criminal charging document states the charges in a format that complies with the Missouri Approved Charges (MACH-CR).  The Tisaby indictment, by contrast, is filled with irrelevant and prejudicial details, including numerous aspersions about Gardner's role in the Greitens investigation.

103.     On July 11, 2019, days after the grand jury used to indict Tisaby had expired,

Carmody took the unusual step of issuing a statement: "Notwithstanding the expiration of that

Grand Jury's term, the investigation into possible criminal activity will continue." The intent of

this announcement was to ensure that a cloud remained over Gardner while Carmody continues

his efforts to have Gardner removed from office.

104.     If Defendants are permitted to continue to abuse the legal process to effectively

engineer Gardner's removal from office, or to curtail her ability to ensure the integrity of the

criminal justice system, both Gardner and the citizens of St. Louis—who overwhelmingly voted

for her and depend upon her to oversee the impartial administration of justice—would be

irreparably harmed.

105.     On September 9, 2019 during a radio interview, Roorda said of Gardner: "This

woman needs to go, she's a menace to society." In the same interview, Roorda threateningly

called for Gardner's removal from office "by force or by choice."

## CAUSES OF ACTION

### <u>Count I</u>
### 42 U.S.C. § 1985(2)-(3): Conspiracy to Interfere with Civil Rights – Against All Defendants

106.     Gardner repeats and realleges each and every allegation contained in the

preceding paragraphs as if fully set forth herein.

107.     When Gardner assumed the role of Circuit Attorney, she took an oath to, in

pertinent part, "support the Constitution of the United States and of the state of Missouri, and

faithfully perform the duties of [her] office."

108.     Defendants, by their actions as hereinbefore alleged, have conspired for the

purpose of impeding, hindering, obstructing, or defeating the due course of justice, with the

intent to injure Gardner or her property for lawfully enforcing and/or attempting to enforce the rights of all persons within the City of St. Louis to equal protection of the laws.

109.    Defendants, by their actions as hereinbefore alleged, have conspired for the purpose of preventing Gardner, in her role as Circuit Attorney, from securing to all persons within the City of St. Louis the equal protection of the laws.

110.    Defendants have undertaken acts in furtherance of this conspiracy by obstructing her efforts to restore faith in the criminal justice system among communities of color and impose needed oversight over police violence, including without limitation by abusing legal process in an attempt to engineer her removal from office on false pretenses.

111.    By reason of the foregoing, Gardner sustained damages and faces irreparable harm on an ongoing basis.

### Count II
### 42  U.S.C. § 1983: Fourth Amendment – Against Defendants Gerard Carmody, Patrick Carmody, and Ryann Carmody

112.    Gardner repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

113.    Because no truthful information exists that could conceivably have caused the issuance of the search warrant Carmody obtained in February 2019, Gardner is informed and believes that Defendant Carmody made knowingly false representations to the issuing court to obtain unlawful and fraudulent authorization to conduct unreasonable searches and seizures of the Circuit Attorney's Office and electronic files.

114.    But for these knowingly false representations, the warrant would not have issued.

115.    Given the obvious overbreadth of the warrant in relation to the criminal allegations at issue, any reasonable law enforcement officer would have known that probable cause could not possibly have supported the scope of the warrant.

116.    Defendants Carmody, Patrick Carmody, and Ryann Carmody executed these unlawfully obtained warrants, which they knew or should have known were unlawful, and carried out unreasonable searches and seizures of the Circuit Attorney's office and electronic files.

117.    Gardner did not consent to any of the searches and seizures herein described.

118.    The searches and seizures herein described were unaccompanied by any probable cause or reasonable suspicion.

## Count III
### 42 U.S.C. § 1983: Abuse of Process – Against Defendants City, Gerard Carmody, Patrick Carmody, and Ryann Carmody

119.    Gardner repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

120.    The City Counselor is empowered by the City's Charter to represent the City in legal matters and to make final decisions concerning the City's legal positions.  Accordingly, the City Counselor's decision to seek the appointment of a Special Prosecutor was the act of the City's final policymaker for purposes of *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

121.    Defendants City, Carmody, Patrick Carmody and Ryann Carmody, by instituting a baseless criminal investigation of Gardner, groundlessly seeking and obtaining the appointment of a Special Prosecutor, and searching and seizing the files of the Circuit Attorney without

probable cause, Defendants City, Carmody, Patrick Carmody and Ryann Carmody made an illegal, improper, perverted and unwarranted use of legal process.

122. The subjective purpose of Defendants' actions was not to achieve any authorized or warranted end, but was to harass, intimidate, and punish Gardner, obstruct her ability to provide equal justice under law to the people of the City of St. Louis, and engineer her removal from office.

123. Gardner has suffered damage and injury as a result of Defendants' abuse of process.

## PRAYER FOR RELIEF

WHEREFORE, Gardner respectfully requests judgment against Defendants as follows:

1. awarding compensatory damages against all Defendants in an amount to be determined at trial;

2. awarding punitive damages in an amount to be determined at trial;

3. enjoining Defendants from violating Gardner's rights under federal law;

4. awarding Gardner reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

5. directing such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff Kimberly Gardner demands a trial by jury of all issues in this case.

Dated: February 28, 2020

Respectfully submitted,

/s/ Roy L. Austin, Jr.
Roy L. Austin, Jr., *admitted pro hac vice*
Stephen W. Miller, *admitted pro hac vice*
Harris, Wiltshire & Grannis LLP
1919 M Street, NW
The Eighth Floor
Washington, DC 20036
Phone: (202) 730-1300
Fax: (202) 730-1301
raustin@hwglaw.com
smiller@hwglaw.com

/s/ Jonathan S. Abady
Jonathan S. Abady, *admitted pro hac vice*
Matthew D. Brinckerhoff, *admitted pro hac vice*
David Lebowitz, *admitted pro hac vice*
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
Phone: (212) 763-5000
Fax: (212) 763-5001
jabady@ecbalaw.com
mbrinckerhoff@ecbalaw.com
dlebowitz@ecbalaw.com

/s/ Sarah Jane Hunt
Thomas E. Kennedy, III (Bar No. 46617 MO)
Sarah Jane Hunt (Bar No. 63899 MO)
MaryAnne Quill (Bar No. 71133 MO)
Kennedy Hunt, P.C.
906 Olive St., Suite 200
St. Louis, MO 63101
Phone: (314) 872-9041
Fax: (314) 872-9043
tkennedy@kennedyhuntlaw.com
sarahjane@kennedyhuntlaw.com
mquill@kennedyhuntlaw.com

***ATTORNEYS FOR PLAINTIFF***

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2020 the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following attorneys of record:

Brent Dulle
Andrew D. Wheaton
Associate City Counselors
1200 Market Street, Room 314
St. Louis, Missouri 63103
314-622-4644
DulleB@stlouis-mo.gov
WheatonA@stlouis-mo.gov

ATTORNEYS FOR DEFENDANTS CITY AND GERARD, PATRICK, AND RYANN CARMONDY

Neil J. Bruntrager                           Brian Milliken
Bruntrager & Billings, PC                    Millikan Wright, LLC
225 S. Meramec Ave., Suite 1200              12180 Old Big Bend Road
St. Louis, Missouri 63105                    St. Louis, MO 63122
314-646-0066                                 314-621-0622
njbatty@aol.com                              bmillikan@millikanwright.com

ATTORNEYS FOR DEFENDANTS ROORDA AND SLPOA

Elkin Kistner                                Paul Martin
Bick & Kistner, PC                           Paul Martin, PC
101 South Hanley Road, Suite 1280            101 S. Hanley Road, Suite 1280
St. Louis, Missouri 63105                    St. Louis, Missouri 63105
314-571-6823                                 314-805-8800
elkinkis@bick-kistner.com                    paul@paulmartinpc.com

ATTORNEYS FOR DEFENDANT CHARLES LANE


_/s/  Sarah Jane Hunt_