## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

KIMBERLY M. GARDNER,

                 Plaintiff,

     v.

CITY OF ST. LOUIS; THE ST. LOUIS
POLICE OFFICERS ASSOCIATION,
FRATERNAL ORDER OF POLICE LODGE
68; JEFFREY ROORDA; GERARD
CARMODY; PATRICK CARMODY;
RYANN CARMODY; and CHARLES
LANE,

                 Defendants.

Civ. Action No. 4:20-cv-00060

## PLAINTIFF'S CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND MOTIONS TO STRIKE

## **TABLE OF CONTENTS**

PAGE NO.

TABLE OF AUTHORITIES ....................................................................................iii-vi

PRELIMINARY STATEMENT ...................................................................................1

FACTS ...........................................................................................................................4

      A.     The History of Invidious Racial Animus Within the City, Its Police
             Division, and the SLPOA ...........................................................5

      B.     Defendant SLPOA's Support for White Officers Accused of
             Committing Violent Acts Against Black Officers and Citizens ................7

      C.     Defendants' Resistance to Gardner's Attempts to Promote and Increase
             Racial Equality in the St. Louis Criminal Justice System ..........................9

      D.     Defendants' Attempts to Intimidate, Silence, and Sideline Gardner and
             Thus Prevent Her from Providing Equal Protection of the Law to All .....12

      E.     Defendants' Unconstitutional Search and Seizure of the Circuit
             Attorney's Investigative Files and Cooptation of the Grand Jury
             Process ...........................................................................................17

            1.     The Unconstitutional Search........................................................17

            2.     Grand Jury.................................................................................19

            3.     Defendants Roorda and SLPOA ..................................................20

            4.     Defendant Lane ..........................................................................21

ARGUMENT ..............................................................................................................21

    I.     THE COMPLAINT PLAUSIBLY ALLEGES THAT DEFENDANTS
          WORKED TOGETHER TO IMPEDE CIRCUIT ATTORNEY GARDNER'S
          EFFORTS TO ENSURE EQUAL TREATMENT FOR AFRICAN
          AMERICANS, IN VIOLATION OF 42 U.S.C. § 1985 ......................................22

      A.     Coordinated Conduct and Relationships Amongst the Defendants,
             Combined with Deviations from Standard Procedures, Plausibly
             Establish a Strong Inference of Conspiracy.............................................25

i

B.    Because Gardner's Primary Agenda Is to Eliminate Racial Disparities in St. Louis Policing, Opposition to Gardner Is Almost Certainly Racially Motivated.................................................................27

C.    The Complaint Easily Satisfies the Other Elements of a Section 1985 Claim..................................................................................29

II.    THE EXTRAORDINARY BREADTH OF THE SEARCH WARRANT SECURED BY THE CARMODYS AND ITS EXECUTION GIVE RISE TO THREE INDEPENDENT FOURTH AMENDMENT VIOLATIONS................30

A.    It Is Plausible to Conclude that Gerard Carmody Submitted Deceptive Information in Order to Obtain Such a Breathtaking Search Warrant.......30

B.    Patrick Carmody's and Ryann Carmody's Participation in Executing a Facially Defective Search Warrant Violated the Fourth Amendment.......32

C.    The Carmodys Participated in Seizing and Retaining Materials from Gardner's Office that Were Outside the Scope of the Search Warrant in Violation of the Fourth Amendment.........................................................33

D.    Gardner's Expectation of Privacy Concerning Her Personal and Confidential Documents, Including Documents Exchanged with Attorneys Representing Her in Her Individual Capacity, Was Reasonable ..................................................................................33

III.    THE CITY AND THE CARMODYS' UNJUSTIFIABLE CRIMINAL INVESTIGATION INTO GARDNER IS AN ABUSE OF PROCESS...............36

IV.    NEITHER THE CITY NOR THE CARMODYS CAN ESCAPE LIABILITY ...38

A.    The City Counselor is a Final Policy Maker for Purposes of Municipal Liability Under *Monell* ..........................................................................38

B.    The Carmodys Are Not Immune from Liability for Their Misconduct......39

V.    DEFENDANT LANE'S AND THE SLPOA DEFENDANTS' MOTIONS TO STRIKE SHOULD BE DENIED ........................................................41

CONCLUSION..................................................................................................42

# TABLE OF AUTHORITIES

**CASES:**

*Anderson v. Larson*,
    327 F.3d 762 (8th Cir. 2003) ................................................................. 39, 40

*Angarita v. St. Louis County*,
    981 F.2d 1537 (8th Cir. 1992) ............................................................... 38, 39

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................... 22

*Biby v. Bd. of Regents, of Univ. of Neb. at Lincoln*,
    419 F.3d 845 (8th Cir. 2005) ....................................................................... 35

*Block v. Dupic*,
    758 F.3d 1062 (8th Cir. 2014) ..................................................................... 30

*Brewer v. Hoxie Sch. Dist. No. 46 of Lawrence Cty, Ark.*,
    238 F.2d 91 (8th Cir. 1956) ........................................................ 3, 23, 24, 27

*Brown v. Bd. of Educ. of Topeka*,
    347 U.S. 483 (1954) ...................................................................................... 24

*Buckley v. Fitzsimmons*,
    509 U.S. 259 (1993) ................................................................................ 40, 41

*Burns v. Reed,*
    500 U.S. 478 (1991) ...................................................................................... 40

*Cook v. Sheldon*,
    41 F.3d 73 (2d. Cir. 1994) ............................................................................ 36

*Coons v. Mineta*,
    410 F.3d 1036 (8th Cir. 2005) ..................................................................... 22

*Cramer v. Crutchfield*,
    648 F.2d 943 (4th Cir. 1981) ....................................................................... 37

*Cruz v. Kauai County*,
    279 F.3d 1064 (9th Cir. 2002) ..................................................................... 41

*Davison v. City of Minneapolis, Minn.*,
    490 F.3d 648 (8th Cir. 2007) ....................................................................... 39

*Eckert v. Titan Tire Corp.*,
    514 F.3d 801 (8th Cir. 2008) ....................................................................... 22

*Erickson v. Pawnee Cty. Bd. of Cty. Comm'rs*,
    263 F.3d 1151 (10th Cir. 2001) ................................................................. 37

*Fagnan v. City of Lino Lakes, Minn.*,
    745 F.3d 318 (8th Cir. 2014) ............................................................... 36, 37

*Forrester v. White*,
    484 U.S. 219 (1987) ...................................................................................... 39

*Great Am. Fed. Sav. & Loan Assoc. v. Novotny*,
    442 U.S. 366 (1979) ...................................................................................... 23

*Griffin v. Breckenridge*,
    403 U.S. 88 (1971) ........................................................................................ 23

*Hawkins v. Gage County, Neb.*,
    759 F.3d 951 (8th Cir. 2014) ....................................................................... 30

*Humphrey v. Vision Fin. Corp.*,
    No. 4:12 Civ. 198 (JAR), 2012 WL 3038539 (E.D. Mo. Jul. 25, 2012) ......................... 21

*Hunter v. Namanny*,
    219 F.3d 825 (8th Cir. 2000) ....................................................................... 30

*Imbler v. Pachtman*,
    424 U.S. 409 (1976) ...................................................................................... 40

*James v. Hampton*,
    592 F. App'x 449 (6th Cir. 2015) ................................................................ 35

*Jennings v. Shuman*,
    567 F.2d 1213 (3d Cir. 1977) ....................................................................... 37

*Kalina v. Fletcher*,
    522 U.S. 118 (1997) ................................................................................ 40, 41

*Kiesling v. Holladay*,
    859 F.3d 529 (8th Cir. 2017) ....................................................................... 32

*Kush v. Rutledge*,
    460 U.S. 719 (1983) ................................................................................ 23, 24

*Malley v. Briggs*,
    475 U.S. 335 (1986) ................................................................................ 32, 39

*Messerschmidt v. Millender*,
    565 U.S. 535 (2012) ...................................................................................... 32

*Myers v. Morris,*
    810 F.2d 1437 (8th Cir. 1987) ...................................................................... 40

*O'Connor v. Ortega,*
    480 U.S. 709 (1987)...................................................................... 35, 36

*Pembaur v. City of Cincinnati,*
    475 U.S. 469 (1986)...................................................................... 39

*Praprotnik v. City of St. Louis,*
    879 F.2d 1573 (8th Cir. 1989) ...................................................................... 39

*Purcell Tire & Rubber Co. v. MB Fin. Bank, NA,*
    No. 4:09 Civ. 00179, 2011 WL 1258299 (E.D. Mo. Mar. 31, 2011) ........................ 31, 37

*Ritterbusch v. Holt,*
    789 S.W.2d 491 (Mo. 1990) ...................................................................... 37, 38

*Rose v. Bartle,*
     871 F.2d 331 (3d Cir. 1989).................................................................... 37

*Schwend v. US Bank, N.A.,*
    No. 4:10 Civ. 1590, 2011 WL 108720 (E.D. Mo. Jan. 12, 2011)....................................42

*Small v. McCrystal,*
    708 F.3d 997 (8th Cir. 2013) ...................................................................... 30

*Smith v. Bacon,*
    699 F.2d 434 (8th Cir. 1983) ...................................................................... 25

*Sperano v. Zeus Tech., Inc.,*
    No. 4:12 Civ. 578 (JAR), 2012 WL 2117872 (E.D. Mo. June 11, 2012)........................ 42

*Spivey v. Robertson,*
    197 F.3d 772 (5th Cir. 1999) ...................................................................... 41

*Stanbury Law Firm v. I.R.S.,*
    221 F.3d 1059 (8th Cir. 2000) ...................................................................... 42

*Stepnes v. Ritschel,*
    663 F.3d 952 (8th Cir. 2011) ...................................................................... 33

*Taylor v. State of Minnesota,*
    466 F.2d 1119 (8th Cir. 1972) ...................................................................... 33

*United States v. Jacobs,*
    986 F.2d 1231 (8th Cir. 1993) ...................................................................... 30

*United States v. Leon*,
    468 U.S. 897 (1984) ........................................................................................ 32

*United States v. Slanina*,
    283 F.3d 670 (5th Cir. 2002), *cert. granted, judgment vacated on other grounds*,
    537 U.S. 802 (2002) .................................................................................. 35, 36

*United States v. Wells*,
    223 F.3d 835 (8th Cir. 2000) ........................................................................ 32

*Voyticky v. Village of Timberlake*,
    412 F.3d 669 (6th Cir. 2005) ........................................................................ 38

*Walden v. Carmack,*
    156 F.3d 861 (8th Cir. 1998) ........................................................................ 33

*White v. Walsh,*
    649 F.2d 560 (8th Cir. 1981) ..................................................................... 2, 25

**STATUTES:**

42 U.S.C. § 1983 ................................................................................................ 26, 27

42 U.S.C. § 1985 .............................................................................................. *passim*

Plaintiff Kimberly M. Gardner submits this memorandum of law in opposition to the various motions to dismiss or to strike filed by (1) the City of St. Louis (the "City"); (2) Gerard Carmody, Patrick Carmody, and Ryann Carmody (together, the "Carmodys"); (3) the St. Louis Police Officers' Association ("SLPOA"), and its Executive Director, Jeffrey Roorda (together the "SLPOA Defendants"); and (4) Charles Lane.

## PRELIMINARY STATEMENT

Plaintiff Kim Gardner promised hope and progress to the people of St. Louis. When they elected her as their first ever black Circuit Attorney, she began implementing a comprehensive plan to realize those promises and to address the racial inequality and prejudice that stubbornly endures in the City's criminal justice system. Defendants have conspired to stifle her progress at every step, throwing caution and the constitution to the wind. Through a coordinated campaign of cronyism and intimidation, Defendants obstructed prosecutions of police-involved shootings of young black men, engineered the appointment of crooked special prosecutors, instituted baseless criminal investigations, stormed her offices without a proper warrant, and seized investigative files that frustrated the impartial administration of equal justice under the law for the people of St. Louis. Defendants now try to dodge liability not by denying any of the factual allegations in the Complaint—because they cannot—but by spinning convoluted, confusing, and ultimately meritless legal arguments. In painstaking detail, the Complaint plausibly alleges that Defendants conspired to obstruct Gardner's drive to ensure equal treatment for the people of St. Louis, offered misrepresentations to obtain and illegally execute a search warrant, and blatantly abused the criminal process. At this stage, nothing more is required.

All Defendants move to dismiss Count I of the Complaint, which is brought pursuant to the civil rights conspiracy statute, now codified as 42 U.S.C. § 1985, passed by Congress as part of the Ku Klux Klan Act in 1871. Reading its plain language and origin, courts have consistently

1

interpreted Section 1985 as creating a private right of action against both private and state actors insofar as they conspire and take actions designed to create or maintain unequal treatment of citizens based on race.

The Complaint alleges that each Defendant coordinated or conspired with others to thwart and inhibit Gardner's well-known agenda of addressing the continued scourge of discriminatory treatment suffered by African Americans in St. Louis, at the hands of members of the Police Division, whether they are civilians or police officers themselves. Defendants' arguments to the contrary are wrong. They uniformly misapprehend the nature of racially motivated misconduct and conspiracy. Those who engage in coordinated activities designed to discriminate based on race, or to maintain entrenched patterns of unequal treatment based on race, like Defendants, rarely do so openly and notoriously. For the most part, Defendants did not act openly and notoriously here. But that doesn't matter. The racially motivated attacks on Gardner and her office are actionable whether or not the Defendants brag about them publicly.

"Conspiracies are by their nature usually clandestine. It is unlikely that a plaintiff in a conspiracy case will be able to provide direct evidence of a conspiratorial agreement. Thus, such evidence is not necessary to prove that a civil conspiracy existed." *White v. Walsh*, 649 F.2d 560, 561 (8th Cir. 1981) (internal quotation marks and citation omitted). Accordingly, and not surprisingly, at the pleading stage and often even at trial, there is no *direct* evidence of conspiracy and racial motive. Instead, a court measuring the sufficiency of a complaint—and even a jury determining whether a plaintiff has proven that it is more likely than not that such a conspiracy animated by racial motivations existed—may rely entirely on circumstantial evidence and reasonable inference. Here, Plaintiff alleges an agreement amongst the Defendants to intimidate Gardner and otherwise prevent her from accomplishing her goal of decreasing racial

2

disparities in policing in St. Louis—and within the Police Division itself—that can be plausibly
inferred from the facts in the Complaint. While direct evidence of racially motived coordination
may well be uncovered during discovery, there is nothing insufficient about the mountain of
compelling—and indeed indisputable—circumstantial evidence that more than plausibly
indicates that Defendants coordinated their efforts against Gardner in an attempt to personally
and professionally destroy her because of her pro-racial equality agenda. Defendants' motions to
dismiss Count I should be denied.

In addition, the Carmodys' procurement and execution of a nearly boundless search
warrant for Gardner's electronic files violated her Fourth Amendment rights in three distinct
ways. First, to obtain the warrant, Gerard Carmody must have deceived the court, presenting
deliberate falsehoods that were critical to establishing probable cause and obtaining a warrant
that permitted searching for general terms such as "notes" that had no limiting nexus to the
suspected criminal activity. Second, it would be obvious to anyone from the face of the warrant
that it was defective because the search terms were so far-reaching, but Defendants Patrick and
Ryann Carmody executed it anyway. Third, the Carmodys somehow managed to exceed even the
vast scope of the warrant, snatching the Circuit Attorney's Office's entire server, instead of
searching for files that met the terms. The Carmodys' premature argument that Gardner did not
have a reasonable expectation of privacy in her personal files on the server ignores Supreme
Court precedent that government employees do not check their Fourth Amendment rights at the
office door.

Finally, the City and the Carmodys illegally used criminal processes for an improper
purpose: furthering their unconstitutional conspiracy by harassing, intimidating, and punishing
Gardner. Ignoring the merits of this claim, the City and the Carmodys assert only that the Eighth

Circuit has not recognized this claim. But they fail to explain why the majority of the Circuit Courts to have decided the question—all but one—have concluded that abuse of criminal process is a *per se* violation of due process rights and subjects the violators to liability under § 1983.

The attempts by the City and the Carmodys to escape liability fail. The City Counselor has statutory authority to lead the City's law department and set its policy; they are therefore the prototypical policymaking official who may subject a government to liability by their actions alone. The Carmodys' inexperience as prosecutors is evident in their desperate but misguided grasps at prosecutorial immunity. Prosecutors are only immune for conduct that is among the core prosecutorial functions. When Gerard Carmody presented false information to the court to obtain a search warrant he knew was unsupported by probable cause, he acted as a witness, not as a prosecutor. Patrick and Ryann were personally present for the execution of that warrant, and it is black letter law that prosecutors who execute search warrants are no more immune than the officers they direct.

Mr. Lane generally follows the other Defendants, as he has all along, which enhances the irony of his argument that he is prejudiced by being included with the other Defendants. He claims the larger controversy about racial equality does not really involve him, yet he fails to acknowledge that he injected himself into the overall course of conduct and necessarily must answer for the part he has chosen to play in perpetuating racial bias in St. Louis.

## FACTS

The facts alleged in the Complaint are largely indisputable. Open to dispute or not, however, they must be accepted as true for purposes of Defendants' motions to dismiss. These legally established facts give rise to a powerful inference of coordinated action amongst the Defendants, all geared towards stymieing Gardner's efforts to increase racial equality and non-discrimination within the Police Division and in the manner the Police Division operates

4

throughout the City of St. Louis. Defendants' combined efforts to thwart policies and practices designed to promote and achieve equal treatment irrespective of race, in turn, lead to the inescapable conclusion that Defendants' actions must be animated by a desire to maintain racial inequality and are thus prohibited by Section 1985. These facts, as alleged in the Complaint, are as follows:

### A.   The History of Invidious Racial Animus Within the City, Its Police Division, and the SLPOA

Defendants argue *both* that the Complaint "alleges no facts to show a class-based, invidiously discriminatory animus," City Mem. 1, Carmody Mem. 2, *and* that the Complaint makes "a wide variety" of such allegations over approximately 88 of its paragraphs, Lane Mot. to Strike Mem. 1. We begin by reminding the Defendants and the Court that the racial context within which the Defendants acted is critical to the inferences that should reasonably be drawn in the Plaintiff's favor on these motions.

The Complaint sets out statistical evidence of racial inequality in St. Louis policing thoroughly. Despite the nearly 1-to-1 ratio of white and black residents, there are more than twice as many white police officers as black police officers (66% white, 30% black). Compl. ¶¶ 22-23. White officers are also significantly overrepresented in managerial and command positions and in the most desirable specialized units. *Id.*

While blacks are substantially underrepresented in the Police Division, they are significantly overrepresented in the number of traffic stops, searches, and arrests carried out by police officers. In 2016, blacks were 85% more likely to be stopped by the Police Division than whites. In 2017, that number was 97%, and in 2018, it was nearly 120%. *Id.* ¶ 24.

In 2012, nearly twice as many blacks as whites were stopped by police in St. Louis, while more than three times as many blacks were searched by police. Comparable or worse disparities

persisted in 2013 (blacks accounted for 68% of stops and 80% of searches), 2014 (66% of stops and 77% of searches), and 2015 (64% of stops and 72% of searches). Notwithstanding the wide disparity in stops, searches, and arrests of blacks as compared to whites from 2012 to 2015, blacks were significantly *less* likely to be found with contraband. *Id.* ¶¶ 25-26. Meanwhile, in 2015, about 75% of adults arrested in the City were black, while around 25% were white. Similarly, in 2018, of those arrested for FBI Part II Crimes (less serious) in St. Louis, 75.2% were black and 24.6% were white. *Id.* ¶¶ 27-28.

As of 2016, black police officers in the Police Division were subjected to more severe disciplinary treatment than white officers. Indeed, black officers were punished much more severely for minor infractions than white officers were punished for major cases of police misconduct. *Id.* ¶ 29. In the years before and up through at least 2016, when Gardner was sworn in as the first ever black Circuit Attorney for St. Louis, explicit expressions of racial animus were prevalent within the membership of the Police Division and the SLPOA and ignored or condoned by their leaderships. *Id.* ¶ 30.

There are white supremacists on the St. Louis police force. In 2019, the Plain View Project, a research project created to identify public Facebook posts and comments by police officers that could erode civilian trust and confidence in law enforcement, revealed that a number of St. Louis officers had posted racist and offensive content on social media over a period of years. In total, the Plain View Project identified approximately 420 such posts by current and former Police Division officers. *Id.* ¶¶ 31-32. Examples of the types of racist invective spewed by eight current and former members of the St. Louis police force and the SLPOA, as revealed by the Plain View Project, are set forth in paragraphs 33-40 of the Complaint. *Id.* ¶¶ 33-40.

In addition to the deplorable conduct of the eight officers set forth in paragraphs 33-40 of the Complaint, the Plain View Project identified at least 23 other St. Louis officers who had *publicly* posted racist and offensive content on Facebook. One such post advocated that blacks found an independent country where "they can have their own taxes . . . and pay their own welfare . . . . Oooooppps, small problem here, they might have to work for a living, oh well scrap that idea." Another offered to sell a t-shirt emblazoned with the words, "Black Lives Splatter, because Blue lives matter." *Id.* ¶ 41.

Defendant Roorda, the executive director of the SLPOA, was aware of the offensive conduct of the police officers and union members exposed by the Plain View Project. Indeed, Defendant Roorda was Facebook "friends" with many of the officers whose bigoted posts were unearthed, and he remained Facebook "friends" with at least seven such officers at the time the Complaint was filed. *Id.* ¶¶ 33, 36, 42-43.

And, notwithstanding the alarming behavior exposed by the Plain View Project, neither SLPOA nor the Police Division took any action against the vast majority of the members or officers who have made racist or offensive posts; they have not promulgated any policies or instituted any training or discipline to address prevalent racism within their ranks. *Id.* ¶ 44.

### B.   Defendant SLPOA's Support for White Officers Accused of Committing Violent Acts Against Black Officers and Citizens

Defendants SLPOA and Roorda both have histories of supporting white officers accused of violence against black citizens, and in some cases even against black police officers. Defendant Roorda has written two books in which he characterizes public concerns about Michael Brown's death and policing in Ferguson[1] as part of a "War on Police." Roorda was an

---

[1] On August 9, 2014, Ferguson, Missouri police officer Darren Wilson shot and killed 18-year-old Michael Brown. Wilson is white, and Brown was black. The incident touched off months of unrest in Ferguson, a city less than 10 miles from St. Louis, and elsewhere. The U.S. Department of Justice investigated the incident and Ferguson Police

ardent supporter and defender of Darren Wilson, and publicly wore an armband that read, "I am Darren Wilson." *Id.* ¶ 46.

Defendant SLPOA, meanwhile, paid the bail of Jason Stockley, a white officer in the Police Division who shot and killed a black motorist named Anthony Lamar Smith in December 2011. Stockley was in possession of an assault rifle that was not authorized by the police department, and the in-car camera captured him saying to his fellow officer, "Going to kill this mother fucker, don't you know it." After a chase ended with the deployment of Smith's airbag, Stockley exited his vehicle, walked to Smith's vehicle, raised Smith's airbag, and shot Smith several times. Stockley claimed he acted in self-defense, but the handgun which a gloved Stockley allegedly recovered from Smith's car contained Stockley's DNA and none of Smith's. *Id.* ¶ 47.

On September 15, 2017, after a bench trial, a St. Louis Circuit Court Judge acquitted Stockley. In his opinion, the Circuit Judge made the claim about Smith that "based on [his] nearly thirty years on the bench, [ ] an urban heroin dealer not in possession of a firearm would be an anomaly." In addition, the Circuit Judge dismissed Stockley's statement "we're killing this motherfucker" as "ambiguous depending on the context." *Id.* ¶ 48.

The acquittal touched off a wave of demonstrations. During the demonstrations, three officers on the Police Division's "Civil Disobedience Team" exchanged text messages gleefully anticipating the opportunity to "whoop some ass," with one writing: "It's gonna get IGNORANT

---

department. The Department of Justice concluded that that the evidence did not support charging Wilson with a violation of federal law, but also found that that "many officers appear to see some residents, especially those who live in Ferguson's predominantly African American neighborhoods, less as constituents to be protected than as potential offenders and sources of revenue . . . . The result is a pattern of stops without reasonable suspicion and arrests without probable cause in violation of the Fourth Amendment; infringement on free expression, as well as retaliation for protected expression, in violation of the First Amendment; and excessive force in violation of the Fourth Amendment." Compl. ¶ 45. Although Ferguson is not within the jurisdiction of the Circuit Attorney or the Police Division, the killing of Michael Brown and its aftermath demonstrates the racial divide occurring in the region as a whole.

tonight!!  But it's gonna be a lot of fun beating the hell out of these shitheads once the sun goes down and nobody can tell us apart!!!!" *Id.* ¶ 49.

One of the officers' victims was a plain-clothes black Police Division detective named Luther Hall, who was thrown to the ground and savagely beaten by white officers. Defendant SLPOA has provided legal representation to at least 4 Police Division officers—all SLPOA members—who were indicted by the U. S. Department of Justice in connection with the Hall beating. One of those officers, Randy Hays, pled guilty to violating Hall's civil rights, admitting that he and his colleagues saw Hall standing in the street—doing nothing criminal or suspicious—and threw him to the ground and beat him because they believed he was a protester. *Id.* ¶¶ 50-51. Joseph "Joe" Marcantano, an active member of SLPOA and former member of its Executive Board, is alleged to have witnessed the beating of Hall and failed to intervene to stop it. Three months after the Hall beating, the City promoted Marcantano to Sergeant. *Id.* ¶ 52.

These allegations of racial animus are anything but "immaterial and impertinent," as Lane argues. They are the inescapable context within which the people of St. Louis asked Gardner to clean house, and within which the Defendants undertook to frustrate the will of the voters and interfere with Gardner's administration of justice.

C.   **Defendants' Resistance to Gardner's Attempts to Promote and Increase Racial Equality in the St. Louis Criminal Justice System**

In 2016, with issues of police violence still prominent in public discourse, Gardner successfully campaigned for election as the Circuit Attorney for the City of St. Louis. She promised voters she would work to rebuild trust in the criminal justice system. *Id.* ¶ 53. As Gardner told the *The St. Louis American* in 2016: "Criminal justice system statistics suggest and too many Americans feel our system is unfair. This lack of faith, and the resulting skepticism in communities of color, have devastating consequences. It makes the job of holding those

9

accountable who commit violent and serious crime difficult by lowering the levels of cooperation with law enforcement, prosecutors, and courts in many of our communities." *Id.* ¶ 54.

Gardner went on to explain that: "By virtually every criminal statistic – arrest rates, sentencing, victims of police use of excessive force – communities of color are disproportionately over-represented. This being a large part of the history of many communities of color, there exists a large, prevailing mistrust of the criminal justice system . . . . The experiences of many white Americans with law enforcement, prosecutors and the courts are significantly different from the experiences of many African Americans." *Id.* ¶ 55.

Gardner was elected as Circuit Attorney in November 2016 and took office on January 6, 2017. She is the first African American ever to be elected as the chief prosecutor for the City of St. Louis. Upon assuming office and consistent with her campaign promises, Gardner has worked tirelessly and taken many concrete steps to improve racial equality and fairness in St. Louis's criminal justice system and to increase trust in the system among communities of color. *Id.* ¶ 56.

Among other reforms, Gardner has created and deployed the most prosecutor-led diversion programs of any office in the state; refused to prosecute cases involving possession of small amounts of marijuana; closed over 30,000 open cases that had been assigned the status "Taken Under Advisement" that were impeding putative defendants' employment opportunities and negatively affecting criminal background checks despite having no likelihood of successful prosecution; led a number of complex investigations into police and public corruption; created a conviction integrity unit; significantly increased victim and witness protection services; established a pilot program with St. Louis's public school system to break the school-to-prison

10

pipeline; significantly decreased the use of pretrial detention in favor of increased reliance on summonses; and implemented implicit bias training. *Id.* ¶ 57.

One of the centerpieces of Gardner's bold plan to achieve racial justice and equality in the St. Louis criminal legal system was to institute a protocol for independent investigations of officer-involved shootings. *Id.* ¶ 58. Police control of officer-involved shooting investigations is a recognized factor in the under-prosecution of police violence. Police officers are often reluctant to testify against fellow officers, or even provide investigators with any evidence, leading to what is known as "the blue wall of silence." Officers who do cooperate with investigators risk alienation or retaliation. *Id.* ¶ 59.

In October 2017, in the wake of Stockley's acquittal, Gardner announced a proposal to hire five investigators, four prosecutors, and two support staff to create an independent team to investigate all police-involved shootings. This new team, independent of the Police Division, would replace the Police Division's own overwhelmingly white "Force Investigation Unit," which was formed in 2014. Published reports suggested that there were at least 25 shootings under investigation at the time of Gardner's proposal. *Id.* ¶ 61.

But Defendant SLPOA expressed "serious concerns" about Gardner's proposal for independent investigation of police shootings and insisted that such shootings should continue to be investigated by the Police Division's own Force Investigation Unit. In March 2018, Gardner's proposal was procedurally killed by the Public Safety Committee of the Board of Alderman, due in significant part to the SLPOA's opposition. *Id.* ¶ 62.

The SLPOA, Roorda, and the Police Division have continued to oppose Gardner's reform efforts at every turn. For example, in August 2018, Gardner announced that her office would no longer accept criminal cases from 28 St. Louis police officers because the Circuit Attorney's

Office determined that it could no longer rely on the veracity of the officers. State and federal prosecutors across the country maintain similar lists, and prosecutors are constitutionally required to disclose impeachment information contained on such lists to defendants and their counsel. Defendant Roorda criticized the creation of this exclusion list on behalf of the SLPOA, calling it "dangerous." *Id.* ¶¶ 63-64.

In January 2019, the Circuit Attorney's Office charged Police Division Officers William Olsten and Joseph Schmitt with first-degree assault and armed criminal action and also charged Schmitt with unlawful use of a weapon for the off-duty assault of a civilian. Schmitt shot the civilian multiple times. Defendant Roorda responded as follows:

> The St. Louis Police Officers Association proudly stands behind our members in their time of need. We are hosting the fundraiser free of charge as we do for the members of our organization all of the time. We are not the least bit concerned about the criminal charges pending against Officer Olsten. The only criminal involved in that case is Kim Gardner, who wrongly charged Officer Olsten and Officer Schmitt for acting in self-defense against a would be cop killer.

*Id.* ¶ 65.

### D.   Defendants' Attempts to Intimidate, Silence, and Sideline Gardner and Thus Prevent Her from Providing Equal Protection of the Law to All

In early 2018, as Defendants' efforts to resist Gardner's agenda of equality, reform, and police accountability reached a fever pitch, news broke that then-Governor Eric Greitens had been accused of taking illicit photographs of a sexual partner against her will. On or about January 11, 2018, the Circuit Attorney's Office opened an investigation. *Id.* ¶ 66. After the Police Division, FBI, and U.S. Attorney refused to provide investigative support, Gardner hired former FBI agent William Don Tisaby, an African American former FBI agent, Air Force veteran, and private investigator, to assist in the investigation. *Id.* ¶ 67.

In March 2018, Greitens's counsel deposed Tisaby about his interview of Greitens's alleged victim. Greitens's defense team was led by Edward L. Dowd, Jr. In May 2018, Dowd

issued a statement claiming that Greitens's team would be filing a police report accusing Tisaby of committing perjury during his deposition. On that same day, the Police Division announced that it would be opening an investigation into the allegations against Tisaby. *Id.* ¶¶ 68-70.

During this period, Gardner began receiving threatening letters filled with racial invective at her office. A letter, received on or about May 16, 2018, called Gardner a "crooked, lying, NIGGER Cunt" and a "lowlife NIGGER BITCH" and demanded that she resign. Another letter from May 2018 called Gardner a "dumb shit burr head" and a "dumb nigger bitch" and claimed her "problem is white people," threatening "you're not going to beat these white boys." Another such letter, received in June 2019, called Gardner "incompitent [sic] and a racist," accused her of being "a handicap to police," directed her to "go away forever," and threatened that "[i]f you don't leave something will be done about you." Gardner reported these letters to the Police Division. The Police Division, however, refused to investigate these potential threats to an elected official, even though at least one of the letters had a name and return address on it. *Id.* ¶ 71.

On June 7, 2018, the Police Division, through the City Counselor's Office, formally asked the Circuit Court for an order appointing a Special Prosecutor to investigate allegations of perjury against Tisaby. The Police Division's motion states that it needed "an impartial prosecuting attorney to evaluate and request investigative subpoenas as part of the Police Division's investigation of the above-referenced alleged criminal conduct involving the circuit attorney's office." *Id.* ¶ 72.

Oral argument on the motion was held on June 27, 2018, before Circuit Court Judge Michael K. Mullen. As a result of representations made by the City, Judge Mullen denied

Gardner's request for an evidentiary hearing, despite the fact that the Police Division's motion had been unverified and there was literally no evidence before the Circuit Court. *Id.* ¶ 73.

Two days later, the Court granted the Police Division's motion and appointed Defendant Gerard Carmody as the Special Prosecutor. The appointment was exceedingly unusual. While it is relatively common for Missouri prosecutors to address conflicts of interest by appointing fellow prosecutors from other jurisdictions, appointing a lawyer from private practice is highly irregular. Carmody's appointment was particularly unusual because his practice was focused almost entirely on commercial real estate and civil litigation. *Id.* ¶ 74. While Carmody's appointment was highly irregular on its face, the process—or lack thereof—that resulted in the appointment was even more so. Nowhere in the Police Division's submissions and arguments to the court, through the City Counselor's office, is there any request, suggestion, or even hint that the special prosecutor should be Defendant Carmody. Had that possibility been disclosed, issues concerning the appointment of a lawyer from private practice would have been raised, along with questions concerning Carmody's qualifications and conflicts. *Id.* ¶ 76.

Had notice been given, the following facts would have been presented:

- Carmody and Dowd are lifelong friends going back to their days graduating in the same class of 1967 and playing on the same sports teams at Chaminade College Preparatory School in St. Louis ("Chaminade"), from which Judge Mullen also graduated.

- A number of children and other relatives of Carmody, Dowd and Judge Mullen graduated from or currently attend Chaminade where Carmody serves on the Board of Trustees.

- Carmody and Dowd are former partners in the Bryan Cave law firm.

- Judge Mullen is Facebook friends with Ryann Carmody, Patrick Carmody, Defendant Roorda, Mary Pat Carl (a candidate who ran against Gardner in 2016), and other relatives of those working against Gardner's reform agenda.

14

- Ryann Carmody acknowledged the closeness between her father and Dowd, and how it could be seen as a conflict with respect to Dowd's representation of Greitens, in a text message to a Circuit Attorney's Office employee.

- Dowd supported Carmody's candidacy to serve on the Appellate Judicial Commission that recommends Missouri's appellate and supreme court justices. Carmody served on the Commission from 1999 to 2005.

- Carmody donated $500 to Patrick Hammacher's campaign when he was running against Gardner in the 2016 race for Circuit Attorney. Patrick Carmody gave $50 to the same campaign against Gardner.

- Carmody and Dowd have jointly represented the same party in litigation at least five times. In at least three additional cases, Carmody and Dowd represented co-defendants. In at least four additional cases, their law firms have represented co-defendants.

- Patrick Carmody is a member of Young Friends of the BackStoppers, an organization with close ties to the Police Division and SLPOA. Young Friends of the BackStoppers is closely affiliated with the BackStoppers, an organization that Dowd once headed and on whose Board of Directors he remains to this day.

- Dowd made contributions to Roorda's political campaigns in 2018 and 2015.

- In 2008, Carmody and Dowd co-hosted a political fundraiser where the guest of honor was then-St. Louis County Prosecutor Bob McCulloch, whom some later accused of skewing the Michael Brown investigation in favor of Darren Wilson.

*Id.* ¶ 77.

The order appointing Gerard Carmody as Special Prosecutor authorized him to draw upon the resources of his law firm, Carmody MacDonald P.C. Gerard Carmody named his daughter and son, Ryann C. Carmody and Patrick G. Carmody, to assist him. *Id.* ¶ 75. Carmody and his children have profited significantly from his appointment as Special Counselor. As of August 2019, the people of St. Louis had already paid Carmody and his law firm just under $400,000 for his work as Special Prosecutor. *Id.* ¶ 78.

Although Gardner has attempted to raise concerns about Carmody's conflicts of interest, filed pleadings, and requested a hearing at which the conflicts issue would be heard, Carmody

repeatedly sought and received delays of any scheduled hearing concerning his conflicts after

Judge Mullen told Carmody that the media might attend a hearing on the conflicts. Subsequently,

there has never been a hearing on this issue. *Id.* ¶ 79.

The more than 50-year relationship between Carmody and Dowd is exponentially closer

and more problematic than the approximately four-month contractual relationship between

Gardner and the Circuit Attorney's ex-private investigator, Mr. Tisaby—an ex-private

investigator in a concluded case. *Id.* ¶ 80.

The unfairness of Carmody's close relationship with Dowd goes beyond the fact that the

Special Prosecutor's very close friend was essentially the complainant in the very matter under

investigation. As the Police Division knew at the time, members of the Dowd Bennett law firm

had told Gardner in March 2018 that they would "ruin" her, "personally and professionally,"

unless she dismissed the charges against Greitens. They repeated their threats in April 2018. This

made the appointment of Dowd's close friend and former law partner wildly unfair. The lack of

notice and of any evidentiary hearing prevented this information from timely coming to light. *Id.*

¶ 81.

Gardner reported the threats from the Greitens legal team to the Police Division in early

June 2018. However, in contrast to its swift opening of an investigation into Dowd's complaint

against Gardner, the Police Division sat on the report for months without any discernible action.

Eventually, in late 2019, Gardner's allegations were referred to a Special Prosecutor—yet

another private lawyer with a close relationship to Dowd's law firm, rather than a serving elected

prosecutor in a neighboring jurisdiction. After a cursory investigation, using the Police Division

as his investigators, that Special Prosecutor declined to pursue charges against those who had

threatened Gardner. *Id.* ¶ 82.

E.      **Defendants' Unconstitutional Search and Seizure of the Circuit Attorney's Investigative Files and Cooptation of the Grand Jury Process**

1.      **The Unconstitutional Search**

On January 24, 2019, Carmody issued a first search warrant to the Circuit Attorney's Office. The Circuit Attorney's Office produced documents responsive to the first warrant— which requested all of Mr. Tisaby's correspondence—on February 4, 2019. *Id.* ¶ 84.

Less than three weeks later, on February 21, 2019, Carmody obtained a second search warrant. This second warrant sweepingly sought electronic communications and files containing any one of thirty-one incredibly broad search terms, including "[n]otes," "[b]ullet [p]oints," and "[v]ideo," without any limiting nexus to Tisaby or the Greitens case. The second search warrant called for any document containing those search terms, so long as it was *stored*—not created— on the Circuit Attorney's Office's server between January 1, 2018 and June 30, 2018, which expanded the universe of requested documents far into the past, covering many open police investigations but without any conceivable tie to Tisaby or Greitens. *Id.* ¶ 85.

The second search warrant, by its terms, allowed any "law enforcement personnel, or other individuals assisting law enforcement personnel" to execute the warrant and conduct the search. Such expansive language meant that Carmody could share what was found with anyone "assisting" the effort, regardless of whether such person had been vetted for conflict of interest, safety, security, and privacy concerns, and regardless of whether that person had been duly appointed as part of the Special Prosecutor's investigation. *Id.* ¶ 86.

To this day, the supporting material submitted to obtain the second search warrant, including the sworn statements and other evidentiary material, has not been made available to Gardner, but the Police Division has represented that Carmody was responsible for requesting the warrant. *Id.* ¶ 87.

Counsel for Gardner and the Circuit Attorney's Office contacted Carmody on February 27, 2019 to point out that "[e]xecuting that search warrant, particularly without agreed-upon safeguards in place, would greatly jeopardize confidential, sensitive information that could put the public at risk as well as jeopardize ongoing investigations and prosecutions" and to request a meeting prior to execution of the search warrant. Carmody first refused to have any such discussion, and then claimed that the only way to comply with his search warrant was to turn over every document and not claim any privilege. *Id.* ¶ 88.

On April 29, 2019, approximately ten to fifteen officers from the Police Division entered the Circuit Attorney's Office to execute the search warrant. Among other things, they threatened to kick in the door to the IT room, forced a Circuit Attorney's Office employee to provide passwords to the office's entire computer system, videotaped numerous other passwords, and physically took the server containing every email for every employee of the Circuit Attorney's Office, including the most obviously privileged emails—emails between the Circuit Attorney and her outside counsel for the investigation being done by Carmody. Contrary to the law prohibiting prosecutors from being present for searches, Ryann Carmody and Patrick Carmody were present at times during execution of the warrant. *Id.* ¶ 92.

As of the date on which the Carmodys and the Police Division seized all the information on the servers of the Circuit Attorney's Office, the Circuit Attorney was investigating approximately 40 cases of alleged police misconduct, including approximately 25 incidents in which people in the City of St. Louis claim either to have been shot by police officers or to have been subjected to some other kind of excessive force. The Circuit Attorney' Office's investigative files therefore contain highly sensitive information, such as the health and financial information of witnesses, subjects, and targets of grand jury investigations. *Id.* ¶ 93.

18

All files seized pursuant to the overbroad search warrant Carmody obtained remain in the possession of the Carmodys and the Police Division. Ryann Carmody told the Circuit Attorney's Office that Carmody did not need the server anymore because Carmody had "mirrored" it. This includes, without limitation, all files on the server in which police officers were under investigation for police misconduct. The Police Division returned the server on July 25, 2019. *Id.* ¶ 94.

### 2.     Grand Jury

Carmody also convened a grand jury for the ostensible purpose of investigating whether Mr. Tisaby, the ex-investigator for the prosecution in the since-dismissed Greitens matter, committed perjury. *Id.* ¶ 96. The grand jury was impermissibly gerrymandered, which resulted in a significantly larger number of Caucasian grand jurors than African American grand jurors. *Id.* ¶ 97.

In April 2019, Carmody subpoenaed then-Chief Investigator and Special Assistant Circuit Attorney Anthony Box. During his grand jury testimony, Mr. Box was several times unconstitutionally denied access to his attorney by Special Prosecutor Gerard and Ryann Carmody, who subjected Mr. Box to hostile, oppressive, and intentionally confusing questioning and improperly inquired about privileged conversations Mr. Box had with his attorney. *Id.* ¶ 99.

On June 14, 2019, the Special Prosecutor's Grand Jury indicted Tisaby on six counts of perjury and one count of tampering with physical evidence. *Id.* ¶ 101.

The Tisaby indictment is not in the usual form for a Missouri indictment. Almost every Missouri criminal charging document states the charges in a format that complies with the Missouri Approved Charges ("MACH-CR"). The Tisaby indictment, by contrast, is filled with irrelevant and prejudicial details, including numerous aspersions about Gardner's role in the Greitens investigation. *Id.* ¶ 102.

On July 11, 2019, days after the grand jury used to indict Tisaby had expired, Carmody took the unusual step of issuing a statement: "Notwithstanding the expiration of that Grand Jury's term, the investigation into possible criminal activity will continue." The intent of this announcement was to ensure that a cloud remained over Gardner while Carmody continued his efforts to have Gardner removed from office. *Id.* ¶ 103.

If  Defendants are permitted to continue to abuse the legal process to effectively engineer Gardner's removal from office, or to curtail her ability to ensure the integrity of the criminal justice system, both Gardner and the citizens of St. Louis—who overwhelmingly voted for her and depend upon her to oversee the impartial administration of justice—will be irreparably harmed. *Id.* ¶ 104.

### 3. Defendants Roorda and SLPOA

As the Special Prosecutor's investigation gathered steam, Defendants SLPOA and Roorda used racist and slanderous rhetoric to advance the improper purposes of the investigation and foment animus against Gardner. *Id.* ¶ 89.

For instance, on March 11, 2019, SLPOA posted an event on its Facebook page entitled "Kim Gardner Hypocrisy-palooza," accusing her of refusing to cooperate with the Special Prosecutor's investigation. To illustrate the event, SLPOA used a black-and-white photograph of two white police officers with two snarling police dogs in a 1960 Ford police car, evoking police use of dogs to attack African Americans during the civil rights movement. *Id.* ¶ 90.

On March 26, 2019, Roorda posted the following on SLPOA's Facebook page: "GARDNER's GUIDE TO OBSTRUCTING JUSTICE IN 10 EASY (ILLEGAL) STEPS: Unbelievable!!! How the St. Louis media gets away with continuing to ignore Kim Gardner's obstruction of justice in the Special Prosecutor/Special Grand Jury investigation of criminal conduct by her office is a case of journalistic malpractice. SOOOOOO, read it hear first! I only

pasted in the first two pages of the Special Prosecutor's reply brief (you can read the whole thing

on Casenet) but it is a scathing plaint of unethical and/or unlawful conduct that Gardner herself

engaged in and continues to engage in. IF she doesn't get indicted for suborning perjury

(575.040 & 562.014 RSMo) and/or interference with legal process (575.160 RSMo) and/or

concealing an offense (575.020 RSMo) and/or obstructing government operations (576.030), I'll

eat my hat!" *Id.* ¶ 91.

On September 9, 2019 during a radio interview, Roorda said of Gardner: "This woman

needs to go, she's a menace to society." In the same interview, Roorda threateningly called for

Gardner's removal from office "by force or by choice." *Id.* ¶ 105.

### 4.    Defendant Lane

In or about April 2019, retired St. Louis Police Department Officer Charles Lane filed a

taxpayer lawsuit against Gardner to prevent her from performing the contracts that she entered

into to compensate the attorneys representing her with respect to Defendant Gerard Carmody's

investigation. On information and belief, Lane is a member of the SLPOA. Lane lived down the

street from Dowd when they were both younger. Lane believes he donated to Hammacher's

campaign against Gardner. Lane is presently involved in a separate lawsuit in which he is

working with the City Counselor's Office. In a sworn deposition, Lane admitted that "there are

no facts in [his] Verified Motion for Temporary Restraining Order that [he] know[s] are true."

Despite the fact that Gardner followed the same protocol of the prior Circuit Attorney, City

Counselor Bush has sided with Lane against Gardner in Lane's lawsuit. *Id.* ¶ 100.

### ARGUMENT

In ruling on the motions to dismiss, "the Court must view the allegations in the

Complaint liberally in the light most favorable to the nonmoving party." *Humphrey v. Vision*

*Fin. Corp.*, No. 4:12 Civ. 198 (JAR), 2012 WL 3038539 at *1 (E.D. Mo. Jul. 25, 2012) (*citing*

*Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008)). "Additionally, the Court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Id.* (internal quotation marks omitted, citing *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005)). "To survive a motion to dismiss, a complaint must contain enough facts to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted, citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## I.   THE COMPLAINT PLAUSIBLY ALLEGES THAT DEFENDANTS WORKED TOGETHER TO IMPEDE CIRCUIT ATTORNEY GARDNER'S EFFORTS TO ENSURE EQUAL TREATMENT FOR AFRICAN AMERICANS, IN VIOLATION OF 42 U.S.C. § 1985

After the Civil War, Congress passed the Ku Klux Klan Act of 1871 to prohibit conspiracies to deny the civil rights of black, formerly enslaved citizens. The portion of the Act now codified as 42 U.S.C. § 1985 provides a private right of action[2] against "two or more persons" if those persons "conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." 42 U.S.C. § 1985(2).

The same statute also creates a claim against "two or more persons" if they "conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from

---

[2] Section 1985 provides that "in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, *the party so injured or deprived may have an action* for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators" 42 U.S.C. § 1985(3) (emphasis added).

giving or securing to all persons within such State or Territory the equal protection of the laws."
42 U.S.C. § 1985(3).

Section 1985(3) provides a civil remedy for conspiracies to interfere with constitutionally
protected rights when motivated by "some racial, or perhaps otherwise class-based, invidiously
discriminatory animus." *See Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971). To state a
claim under Section 1985(3), a plaintiff must plausibly allege: (1) a conspiracy; (2) for the
purpose of depriving, either directly or indirectly, any person or class of persons of the equal
protection of the laws, or of equal privileges and immunities under the laws; (3) an act in
furtherance of the conspiracy; and (4) a resulting injury to a person or property, or deprivation of
a legal right or privilege.[3] *See Great Am. Fed. Sav. & Loan Assoc. v. Novotny*, 442 U.S. 366, 373
(1979) (citing *Griffin*). "The motivation aspect of § 1985(3) focuses not on scienter in relation to
deprivation of rights but on invidiously discriminatory animus," prototypically, racial
discrimination. *Griffin*, 403 U.S. at 102 n.10.

To state a claim under the second clause of Section 1985(2), a plaintiff must plausibly
allege the same elements as Section 1985(3) claim, although the object of the conspiracy must
also be to obstruct the due course of justice. *See Kush v. Rutledge*, 460 U.S. 719, 725 (1983).

The Complaint in this action handily meets both of these requirements. Indeed, this
action is strikingly similar to an Eighth Circuit case, *Brewer v. Hoxie School District No. 46 of
Lawrence County, Arkansas*, 238 F.2d 91 (8th Cir. 1956), brought by members of a school board
against individuals and organizations acting in concert in an attempt to stymie school

---

[3] Defendants' suggestion that Plaintiff is also required to show use of "force, intimidation, or threat," *e.g.* Carmody
Mem. at 8, is plainly wrong. As Defendants themselves acknowledge, Plaintiff is not suing as a "party or witness"
under the first part of § 1985(2). Rather, she is suing under the second part of that subsection, which does not
contain those words at all—as the language quoted by Defendants shows.

desegregation in the wake of the Supreme Court's landmark decision in *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954).

In *Brewer*, as here, plaintiffs were government officials who brought suit as individuals asserting claims under Section 1985(2) and (3).[4]  238 F.2d at 94, 103. In *Brewer*, as here, defendants opposed plaintiffs' efforts to advance racial equality (there in public schools; here in policing) by organizing resistance to plaintiffs' efforts to provide equal treatment under the law and attempting to intimidate plaintiffs so they would relinquish their plans. *Id.* at 93-94. In *Brewer*, as here, defendants' vigorous opposition to a policy designed to address entrenched racial discrimination and inequality in racially segregated schools was sufficient to establish that defendants' actions were racially motivated. Here, the Complaint demonstrates that Defendants openly oppose Gardner's policies designed to address entrenched racial discrimination and inequality in policing and the criminal justice system. In *Brewer*, the Eighth Circuit affirmed the sufficiency of the allegations against defendants for violating Section 1985 and the final judgment and injunction entered against defendants after a bench trial. Like the Eighth Circuit in *Brewer*, this Court should allow Plaintiff's claim seeking relief under Section 1985 to proceed to discovery and trial, so that the right to racial equality can be preserved and vindicated.

---

[4] Lane and the SLPOA Defendants both argue that Plaintiff lacks standing to sue under Section 1985 because she is not seeking to redress a violation of her own rights. Lane Mem. at 2; SLPOA Mem. at 2-3. This argument is based on a misreading of Section 1985. The statute does not confer a cause of action solely on individuals seeking to redress violations of their own civil rights. Rather, it explicitly provides a cause of action to an individual injured by a conspiracy aimed at preventing her from attempting to enforce or secure equal protection of the laws. 42 U.S.C. § 1985(2), (3). As the discussion herein demonstrates, that is what Plaintiff is alleging happened. Plaintiff therefore plainly has standing to bring a claim under § 1985. *See also Brewer*, 238 F.2d 91 (8th Cir. 1956) (affirming judgment in Section 1985 action brought by members of school board injured by a conspiracy to prevent public school desegregation).

A.    **Coordinated Conduct and Relationships Amongst the Defendants, Combined with Deviations from Standard Procedures, Plausibly Establish a Strong Inference of Conspiracy**

"Conspiracies are by their nature usually clandestine. It is unlikely that a plaintiff in a conspiracy case will be able to provide direct evidence of a conspiratorial agreement. Thus, such evidence is not necessary to prove that a civil conspiracy existed." *White v. Walsh*, 649 F.2d 560, 561 (8th Cir. 1981) (citations and internal quotation marks omitted).

While direct evidence is not required, allegations of a conspiracy must be pleaded with sufficient specificity and factual support to "*suggest*" a "meeting of the minds." *Smith v. Bacon*, 699 F.2d 434, 436 (8th Cir. 1983) (emphasis supplied). "The factual basis need not be extensive, but it must be enough to avoid a finding that the suit is frivolous." *Id.* (citation omitted). Plaintiff "must at least allege that the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding, and provide some facts suggesting such a meeting of the minds." *Id.* (citations and internal quotation marks omitted).

Here, the Complaint alleges coordinated actions targeting Gardner and her policies by a web of four interconnected sets of Defendants.

First, the Complaint details the actions taken by Defendants Roorda and the SLPOA (the "SLPOA Defendants") designed to intimidate Gardner and block her efforts to remedy racially discriminatory policing, as well as the various connections between the SLPOA Defendants and other Defendants. Compl. ¶¶ 61-65 (alleging that the SLPOA ensured that Gardner's proposal for independent investigation of police shootings was procedurally killed and that, when Gardner's office criminally charged Police Division Officers, Defendant Roorda made a public statement that the "only criminal involved in that case is Kim Gardner").

Second, the Complaint sets forth the actions taken by Defendant City and the SLPOA Defendants to ensure a special prosecutor sympathetic to their goals was appointed to investigate

25

Gardner and her associates. Defendant City—via the City Counselor and with encouragement from the SLPOA Defendants—secured the highly irregular, conflict-laden, and stealth appointment of Defendant Carmody, a private civil litigator, as the special prosecutor charged with conducting a criminal investigation of the work done by Gardner's office concerning its criminal investigation of former Governor Greitens. *Id.* ¶¶ 69-82. That appointment was an action that itself, along with the steps taken in the investigation by the Carmodys, is independently actionable as a constitutional abuse of process under 42 U.S.C. § 1983. *See infra* § III.

Third, the Complaint lays out the facts concerning the consistently irregular actions taken by the Carmodys (Gerard, Patrick and Ryann), in concert with each other and those working at their direction, including the City through the Police Division, in pursuing the investigation of Tisaby, Gardner, and Gardner's office. Those facts include, among other things: (1) securing a search warrant that violates the Fourth Amendment on its face on overbreadth grounds, and thus must have been obtained through fraudulent means, whether by the submission of deceptive or misleading evidence to Judge Mullen, or because of the pre-existing relationships between Carmody, Judge Mullen and Dowd; (2) executing a search warrant that on its face violates the Fourth Amendment; and (3) seizing and keeping materials that were outside the scope of even the facially overbroad warrant. Compl. ¶¶ 83-88, 92-95. These facts give rise to independent claims for multiple violations of the Fourth Amendment under 42 U.S.C. § 1983. *See infra* § II. As the Carmodys flouted the Fourth Amendment, they were being encouraged and cheered on by Roorda and the SLPOA. Compl. ¶¶ 89-91 (alleging that SLPOA and Roorda "used racist and slanderous rhetoric to advance the improper purposes" of the City's and the Carmodys' investigation and describing specific examples of same).

26

Fourth, the Complaint presents the facts concerning Defendant Lane, former St. Louis police officer and member of the SLPOA with ties to the City and Dowd, who, in the midst of the relentless attacks on Gardner perpetrated by Roorda, the SLPOA, the City, and the Carmodys, sued Gardner to challenge her right to be represented by counsel at City expense in the Carmodys' investigation of actions she undertook solely in her capacity as Circuit Attorney. Compl. ¶¶ 19, 100. This makes Lane, metaphorically, the guy who holds the victim defenseless while someone else punches her. The City, through City Counselor Bush, supports Lane's lawsuit and has worked with Lane in other cases. *Id.* ¶ 100.

Given the coordinated activities, the web of interconnected relationships among Defendants and other key actors, and the substantial deviations from ordinary operations that pervade the Complaint, it is eminently plausible to infer that Defendants collectively have conspired against Gardner and her agenda to take on racial inequality in St. Louis policing. Each Defendant has taken specific steps in furtherance of that conspiracy. Taken together, the allegations in the Complaint bear all of the hallmarks of a conspiracy. Accordingly, the Complaint more than satisfies the pleading standard for the conspiracy elements of Gardner's Section 1985 claims.

B. **Because Gardner's Primary Agenda Is to Eliminate Racial Disparities in St. Louis Policing, Opposition to Gardner Is Almost Certainly Racially Motivated**

Like the plaintiffs in *Brewer v. Hoxie School District*, Gardner is committed to a policy of reforming a governmental institution that has historically pursued policies that discriminate based on race. Like the plaintiffs in *Brewer*, Gardner's policies have not been welcomed by everyone. Defendants are among the people most opposed to Gardner and her agenda. They opposed her election (some even making financial contributions to her opponents) and, after she

27

was elected, they are now collectively working to end her attempts to eliminate racially discriminatory policing in St. Louis.

Taken together, the abundant facts in the Complaint establish that it is more likely than not that the Defendants are engaged in a conspiracy designed to intimidate Gardner, to prevent her from holding police officers accountable for racially discriminatory misconduct, to chase or recall her from office, and to prevent her from seeking reelection—all in service of the goal of shutting down her efforts to address profound racial inequities in St. Louis policing.

In their motions, Defendants frequently focus on the fact that Gardner is African American and argue that the Complaint's allegations are insufficient to plausibly infer that Defendants have a race-based animus against Gardner personally. This argument misses the primary thrust of the Complaint's allegations of a racially motivated conspiracy and demonstrates a misunderstanding of Section 1985 as only protecting against a conspiracy to deprive Gardner of *her own* equal protection rights. This misunderstanding likely stems from the fact that the caselaw Defendants rely on to interpret the statute exclusively involves claims of conspiracies to deprive private individuals of their right to equal protection or equal privileges and immunities under the law. But that is not what Plaintiff is alleging, and the statute plainly authorizes private actions by officials whose job is to secure equal justice for others.[5]

Specifically, the statute explicitly protects against conspirators attempting to prevent a person from "attempting to enforce" or "giving or securing" equal protection of the law to all persons. 42 U.S.C. § 1985(2); (3). Those are the prohibitions Plaintiff alleges Defendants

---

[5] To be sure, Gardner's race and the antipathy towards her that has been publicly expressed by Defendants like Roorda and the SLPOA and various non-party avowed racists, are unquestionably relevant to Gardner's Section 1985 claims. Indeed, these facts independently establish at the motion to dismiss stage that it is plausible to infer that Roorda's and the SLPOA's actions are motived by race. This, however, is not the main basis for concluding that the Complaint plausibly alleges racial motivation.

violated. Compl. ¶¶ 108-09. As set forth in the Complaint, the common thread running through Gardner's actions as Circuit Attorney is her constant, vocal, and ground-breaking commitment to use her position to address the ingrained racial discrimination in the Police Division and the way its members unequally police the black people of St. Louis. These allegations demonstrate that Gardner—both through the "due course of justice," § 1985(2), in her prosecution policies, and otherwise—has worked and continues to work to enforce and extend equal protection to all citizens of St. Louis. Thus, if Plaintiff can show that Defendants have conspired to hamper her efforts, she has a claim under Section 1985 regardless of whether there is any race-based animus toward her personally.

And the Complaint does that. Indeed, because Gardner's primary policy goal as Circuit Attorney has consistently been laser-focused on racial equality in policing, it is impossible to conclude that the unprecedented breadth and depth of opposition toward Gardner displayed by Defendants is not substantially based on opposition to her commitment to advancing racial equality in policing. Thus, the Complaint readily meets the Section 1985 element of racial motivation.

**C.     The Complaint Easily Satisfies the Other Elements of a Section 1985 Claim**

As to the final two elements of a Section 1985(2) or (3) claim—an act in furtherance of the conspiracy and injury to the plaintiff—the Complaint easily establishes both as to each Defendant. Lane is the only Defendant who (halfheartedly) argues Plaintiff has not shown an act in furtherance, but his filing of a lawsuit against Gardner satisfies the element. The Complaint also shows that Plaintiff has been injured by, for instance, Defendants' violations of her Fourth Amendment rights, *see infra* § II, and by her inability to pay her attorneys in Carmody's investigation due to Lane's pending taxpayer lawsuit.

II.   **THE EXTRAORDINARY BREADTH OF THE SEARCH WARRANT SECURED BY THE CARMODYS AND ITS EXECUTION GIVE RISE TO THREE INDEPENDENT FOURTH AMENDMENT VIOLATIONS**

A.   **It Is Plausible to Conclude that Gerard Carmody Submitted Deceptive Information in Order to Obtain Such a Breathtaking Search Warrant**

It is well established that "the Fourth Amendment requires a warrant application to contain a truthful factual showing of probable cause . . . ," *Small v. McCrystal*, 708 F.3d 997, 1006 (8th Cir. 2013) (quoting *Hunter v. Namanny,* 219 F.3d 825, 831 (8th Cir. 2000)), and that a "warrant based upon an affidavit containing deliberate falsehood or reckless disregard for the truth violates the Fourth Amendment and subjects the officer who submitted the affidavit to § 1983 liability." *Block v. Dupic*, 758 F.3d 1062, 1063 (8th Cir. 2014) (internal quotation marks omitted). An affidavit contains a "reckless disregard for the truth" where "the omitted material would be 'clearly critical to the finding of probable cause.'" *Hawkins v. Gage County, Neb.*, 759 F.3d 951, 959 (8th Cir. 2014) (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)). In fact, recklessness may be inferred when the allegedly omitted information would be clearly critical to the finding of probable cause. *Hunter*, 219 F.3d at 830.

Defendant Gerard Carmody was plausibly responsible for requesting a warrant that was unsupported by probable cause and that, on its face, violated the Fourth Amendment. Compl. ¶¶ 85-86. The Complaint alleges that "no truthful information exists that could conceivably have caused the issuance of the search warrant Carmody obtained in February 2019," and that "Carmody made knowingly false representations to the issuing court to obtain unlawful and fraudulent authorization to conduct unreasonable searches and seizures of the Circuit Attorney's Office and electronic files." *Id.* ¶ 113. This allegation is more than plausible in light of the inclusion of thirty-one incredibly broad search terms in the warrant, such as "[n]otes," "[b]ullet [p]oints," and "[v]ideo." *Id.* ¶ 85. On their face, these search terms had no limiting nexus to the

Tisaby or Greitens case and would obviously sweep up almost every document on the Circuit Attorney's Office's server.

Additionally, the warrant called for any document that was *stored*, not created, on the server between January 1, 2018 and June 30, 2018, which expanded the search to also include essentially every document created any time before January 1, 2018, regardless of any temporal relationship to the investigations, so long as that document continued to be stored on the server between January 1, 2018 and June 30, 2018. *Id.* The warrant also allowed any "individual assisting law enforcement personnel" to execute the warrant and conduct the search, permitting the Carmodys to share any document seized with anyone who "assisted" in the search, including persons with conflicts of interest or concerns regarding safety, security, and privacy, regardless of whether the persons were duly appointed to participate in the investigation, and, alarmingly, including people who were themselves under investigation by the Circuit Attorney's Office. *Id.* ¶ 86. Based on the plain overbreadth of the warrant and its lack of nexus to the criminal investigations, and drawing all reasonable inferences in favor of Gardner, there could have been no probable cause for the warrant to issue unless the application included falsehoods and/or reckless omissions. *United States v. Wells*, 223 F.3d 835, 838 (8th Cir. 2000) (a search warrant is invalid if an affidavit, once stripped of its false content, is insufficient to establish probable cause).

The Carmodys impliedly accept these allegations for purposes of argument, *see* Carmody Mem. 12-18, which ends the inquiry. *See Purcell Tire & Rubber Co. v. MB Fin. Bank, NA*, No. 4:09 Civ. 00179, 2011 WL 1258299, at *5 (E.D. Mo. Mar. 31, 2011) ("As a general rule, courts will not consider arguments raised for the first time in a reply.").

**B.      Patrick Carmody's and Ryann Carmody's Participation in Executing a Facially Defective Search Warrant Violated the Fourth Amendment**

Under the plain text of the Fourth Amendment, all people have the right to be free from searches and seizures absent probable cause. Accordingly, a defendant who executes a search warrant that is facially devoid of probable cause violates a searched person's constitutional rights, even if the warrant is issued by a neutral magistrate. Although under certain circumstances the presence of a warrant may confer protection from liability to the person executing it, "[t]he Supreme Court long ago rejected the notion that officers are automatically entitled to qualified immunity because a magistrate approved a warrant application." *Kiesling v. Holladay*, 859 F.3d 529, 533 (8th Cir. 2017) (*citing Malley v. Briggs*, 475 U.S. 335, 345 (1986)). Government actors are not shielded from liability where "'it is obvious that no reasonably competent officer would have concluded that a warrant should issue' . . . for example, where the warrant was 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) (quoting *Malley*, 475 U.S. at 341; *United States v. Leon*, 468 U.S. 897, 923 (1984)).

As an initial matter, the Carmodys make no argument that the existence of the warrant shields them from liability.  Moreover, the Complaint plainly and plausibly alleges that "[g]iven the obvious overbreadth of the warrant in relation to the criminal allegations at issue, any reasonable law enforcement officer would have known that probable cause could not possibly have supported the scope of the warrant." Compl. ¶ 115; *see also id.* ¶¶ 85-86. Because Patrick and Ryann Carmody personally participated in executing a search warrant (which is itself improper) that the Complaint plausibly alleges was unconstitutional on its face, and the execution of a search warrant is plainly an investigative function, *see infra* § IV, their motion to dismiss the Fourth Amendment claim should be denied.

32

**C.    The Carmodys Participated in Seizing and Retaining Materials from Gardner's Office that Were Outside the Scope of the Search Warrant in Violation of the Fourth Amendment**

As set forth above, the search terms in the warrant obtained by the Carmodys had no limiting nexus to any ostensible criminal investigation. *See supra* § II.A. Notwithstanding the overbreadth of these search terms, they imposed an obligation on the Carmodys to tailor their search and seize only the documents and information authorized by the warrant—an obligation the Carmodys brazenly ignored. The mere possession of a search warrant did not "give the [Carmodys] carte blanche as to its execution." *Stepnes v. Ritschel*, 663 F.3d 952, 962 (8th Cir. 2011) (quoting *Walden v. Carmack,* 156 F.3d 861, 873 (8th Cir. 1998)). Where, as here, a warrant does not permit "a general search," items not mentioned in the warrant may only be seized if they are "reasonably related to the crime for which the warrant issued." *Taylor v. State of Minnesota*, 466 F.2d 1119, 1121 (8th Cir. 1972). The search warrant authorized the Carmodys to seek only documents that met certain search terms. Instead, the Carmodys seized the entire server without running any search terms and "mirrored" the entire server without regard to search terms. Compl. ¶¶ 92, 94. Therefore, the Carmodys continue to possess files that they had no authority to seize under the warrant.

**D.    Gardner's Expectation of Privacy Concerning Her Personal and Confidential Documents, Including Documents Exchanged with Attorneys Representing Her in Her Individual Capacity, Was Reasonable**

On April 29, 2019, while a judicial opinion on the constitutionality of the search warrant was still pending, the Carmodys and a group of Police Division members stormed the Circuit Attorney's Office. Compl. ¶ 92. After threatening to kick in the door, they physically seized the office's entire server, including Gardner's personal files. *Id.* As explained above, the Carmodys accept, for purposes of their motions, that the Complaint plausibly alleges that the search warrant for the Circuit Attorney's Office was obtained by submitting a deceitful affidavit and was not

supported by probable cause. *See supra* § II.A. In moving to dismiss Gardner's Fourth

Amendment claims, the Carmodys assert only that Gardner did not have a reasonable expectation

of privacy in her personal files stored on the office's server, simply because she was a

government employee who did not "own" the server. To the contrary, the Carmodys seized some

of Gardner's most private and personal files.

For example, the Carmodys seized Gardner's privileged communications with outside

counsel she had retained to represent her for purposes of the Carmodys' investigation. Compl.

¶ 92. Indeed, it is not surprising that these and similar personal communications and documents

concerning lawsuits brought against Gardner in her personal capacity would reside on the Circuit

Attorney's server. Like most public officials involved in criminal justice, Gardner was often sued

in her personal capacity for actions she took as Circuit Attorney. Given Gardner's strained

relationship with the City Counselor and run-of-the-mill conflicts between her and the City that

prevented the City Counselor from representing both her and the City, she regularly retained

outside counsel to represent her in those lawsuits, and her personal and privileged

communications with outside counsel were on the server seized by the Carmodys. Finally, emails

Gardner sent from her personal email address were stored on the server seized by the Carmodys,

and included private communications regarding bar complaints, her own employment records,

and her medical and financial affairs.[6]

The Carmodys acknowledge that "government employees do not lose their Fourth

Amendment rights merely because they work for the government . . . ." Carmody Mem. 14

---

[6] The Complaint alleges that the server contained personal emails between Gardner and her personal attorneys concerning actions she took in her capacity as Circuit Attorney. Accordingly, this detailed explanation of those personal communications and documents contained on the server is reasonably encompassed by the Complaint as it stands. That said, insofar as the Court concludes that this additional detail cannot be considered unless the complaint is amended, Plaintiff respectfully requests leave to amend the complaint for the sole purposes of adding this detail.

(citing *O'Connor v. Ortega*, 480 U.S. 709 (1987)). And "[n]ot everything that passes through the confines of the business address can be considered part of the workplace context." *O'Connor*, 480 U.S. at 716. The Supreme Court has provided guidance to assist courts in the inquiry of whether an employee's expectation of privacy in the workplace is reasonable, "list[ing] several factors which are relevant . . . , and one such factor is the existence of a workplace privacy policy." *Biby v. Bd. of Regents, of Univ. of Neb. at Lincoln*, 419 F.3d 845, 850 (8th Cir. 2005) (citing *O'Connor*, 480 U.S. at 718-19). In *Biby* the Eighth Circuit ultimately affirmed the district court's grant of summary judgment after finding that the government employee did not have a reasonable expectation of privacy in his computer files, but only after engaging in a searching analysis of the University's computer privacy policy, which instructed users not to expect privacy if the University had a legitimate reason to conduct a search. *Id.* at 850-51.[7]

Applying the *O'Connor* standard, courts routinely find that in the absence of an office privacy policy, government employees do have a reasonable expectation of workplace privacy. *See, e.g.*, *United States v. Slanina*, 283 F.3d 670, 677 (5th Cir. 2002), *cert. granted, judgment vacated on other grounds*, 537 U.S. 802 (2002) ("Accordingly, given the absence of a city policy placing Slanina on notice that his computer usage would be monitored and the lack of any indication that other employees had routine access to his computer, we hold that Slanina's expectation of privacy was reasonable."); *see also James v. Hampton*, 592 F. App'x 449, 455-56 (6th Cir. 2015) ("When confronted with circumstances in which such regulations or prior notice to employees were not in place, other circuits have concluded that public employees do have a reasonable expectation of privacy.") (collecting cases).

---

[7] Even if the City had a similar policy—and there is no indication that they do—as explained above, there was no legitimate reason to search Gardner's files.

*O'Connor* specifically contemplates the evaluation of evidence and any workplace policies impacting the employee's expectations of privacy. 480 U.S. at 718 ("Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis."). The Complaint includes no allegations related to the Circuit Attorney's Office computer privacy policy. Without consideration of such a policy, the Carmodys cannot demonstrate that Gardner's expectation of privacy was anything but reasonable.

## III.   THE CITY AND THE CARMODYS' UNJUSTIFIABLE CRIMINAL INVESTIGATION INTO GARDNER IS AN ABUSE OF PROCESS

The City and the Carmodys abused the legal process to harass Gardner and disturb her attempts to ensure equal justice under the law for the people of the City of St. Louis. They instituted a baseless criminal investigation, groundlessly sought and obtained the appointment of a conflicted Special Prosecutor, and seized the files of the Circuit Attorney's Office without any probable cause to do so.  The suggestion that a claim does not lie for such a flagrant perversion of legal process is contrary to the majority rule and basic principles of justice.

Although the Eighth Circuit has not decided whether a defendant may be liable for abuse of process pursuant to § 1983, *see Fagnan v. City of Lino Lakes, Minn.*, 745 F.3d 318, 324 n.5 (8th Cir. 2014), other Circuits that have considered the question have found a viable claim. For example, in *Cook v. Sheldon*, the Second Circuit unequivocally held that "section 1983 liability may lie for malicious abuse of criminal process." 41 F.3d 73, 80 (2d. Cir. 1994).  The *Cook* court explained that where an abuse of criminal process is alleged, the abuse is "by definition a denial of procedural due process rights." *Id.* (quoting *Jennings v. Shuman*, 567 F.2d 1213, 1220 (3d Cir. 1977)). Several other Circuits have also recognized abuse-of-process claims under § 1983. *See, e.g.*, *Rose v. Bartle,* 871 F.2d 331, 350 n. 17 (3d Cir. 1989); *Cramer v. Crutchfield,* 648 F.2d

36

943, 945 (4th Cir. 1981) (section 1983 action for malicious abuse of process must be based on the deprivation of a constitutional right); *Erickson v. Pawnee Cty. Bd. of Cty. Comm'rs*, 263 F.3d 1151, 1155 (10th Cir. 2001).[8]

The Complaint plausibly alleges the elements of an abuse-of-process claim under § 1983, which mirror the elements of a state law claim. *See Fagnan*, 745 F.3d at 324 n.5 ("If an abuse of process claim is 'cognizable as a federal constitutional claim . . . the elements necessary to prove it would likely mirror those of state law.'" (quoting *Voyticky v. Village of Timberlake*, 412 F.3d 669, 676-77 (6th Cir. 2005))). The City's and the Carmodys' sparse alternative argument that the elements are not sufficiently pleaded hardly warrants discussion.[9]

In Missouri, an abuse-of-process claim includes the following elements: "(1) the present defendant made an illegal, improper, perverted use of process, a use neither warranted nor authorized by the process; (2) the defendant had an improper purpose in exercising such illegal, perverted or improper use of process; and (3) damage resulted." *Ritterbusch v. Holt*, 789 S.W.2d 491, 493 (Mo. 1990). The Complaint satisfies each of these elements. First, the Complaint specifically identifies the processes invoked by Defendants the City and the Carmodys and explains why those processes were not authorized. *See* Compl. ¶ 121 ("Defendants [the City and the Carmodys], by instituting a baseless criminal investigation of Gardner, groundlessly seeking

[8] The City and the Carmodys identified only one Circuit Court that departs from this majority rule. In *Santiago v. Fenton*, the First Circuit mistakenly suggested that the Supreme Court had rejected such a claim by implication, because where there is an objectively reasonable basis for arrest or prosecution, an officer is entitled to qualified immunity regardless of the officer's subjective motivation. This reasoning fails to contemplate the facts as alleged here—that there was no reasonable basis for Defendants' actions, and so their subjective motivations can still render them liable for abuse of process under § 1983.

[9] Although Local Rule 4.01 requires that any memorandum in support of a motion include "citations to any authorities on which the party relies," the City and the Carmodys state only that "Gardner alleges only conclusory unadorned acts and threadbare recitals of elements" with passing reference to the *Twombly/Iqbal* pleading standard. They provide no other authority or explanation for why the allegations are insufficient. Because this argument has not been adequately raised, the Court should not consider it on reply. *See Purcell Tire & Rubber Co.*, 2011 WL 1258299, at *5.

and obtaining the appointment of a Special Prosecutor, and searching and seizing the files of the Circuit Attorney without probable cause . . . made an illegal, improper, perverted and unwarranted use of legal process."). The Complaint alleges with specificity the facts demonstrating that these acts occurred and that their use was illegal. *See id.* ¶¶ 66-105. Second, the Complaint alleges an improper purpose: "to harass, intimidate, and punish Gardner, obstruct her ability to provide equal justice under law to the people of the City of St. Louis, and engineer her removal from office." *Id.* ¶ 122; *see also id.* ¶¶ 66, 103-04. Finally, the Complaint has alleged that these blatant abuses caused damage to Gardner, which need only be described in general terms. *See Ritterbusch*, 789 S.W.2d at 494 ("The final element, damages, is sufficiently stated and the causal relationship to the wrongful acts generally described."); *see also* Compl. ¶¶ 92-93, 105, 123.

## IV.     NEITHER THE CITY NOR THE CARMODYS CAN ESCAPE LIABILITY

### A.     The City Counselor is a Final Policy Maker for Purposes of Municipal Liability Under *Monell*

The City Counselor's decision to seek the appointment of a Special Prosecutor, as the act of any official policymaker, is imputed to the City and renders it liable. The City's argument to the contrary fundamentally misunderstands the imputation of decisions by final policymakers to municipalities for purposes of *Monell* liability. Puzzlingly, the City argues that it cannot be liable for "a *decision* by the City Counselor . . . ." City Mem. 12. But "it is plain that municipal liability may be imposed for a single decision by municipal policymakers . . . whose acts or edicts may fairly be said to represent official policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986); *see also Angarita v. St. Louis County*, 981 F.2d 1537, 1546 (8th Cir. 1992) ("Municipal officials who have final policymaking authority may, by their actions, subject the government to Section 1983 liability.").

38

There can be no question that the St. Louis Charter confers final policymaking authority on the City Counselor to represent the City in legal matters and to make final decisions concerning the City's legal positions. "[F]inal policymaking officials are to be identified by reference to state law (including valid local ordinances and regulations)." *Praprotnik v. City of St. Louis*, 879 F.2d 1573, 1574 (8th Cir. 1989). Where a city official such as the City Counselor is involved, "courts consult the applicable city charter, code or ordinances." *Davison v. City of Minneapolis, Minn.*, 490 F.3d 648, 661 (8th Cir. 2007). Article X, Section 2 of the St. Louis Charter appoints the City Counselor as the "head of the law department" and vests the holder of the position with the power to "direct the management of all the litigation in which the city is a party" and "represent the city in all legal matters and proceedings in which the city is a party or interested."

Because the City Counselor is the final decision maker concerning requests by the City to seek a Special Prosecutor, the City is subject to municipal liability for abuse of process.

### B.    The Carmodys Are Not Immune from Liability for Their Misconduct

In deciding whether absolute immunity applies to a prosecutor's conduct, courts "must look to 'the nature of the function performed, not the identity of the actor who performed it.'" *Anderson v. Larson*, 327 F.3d 762, 768 (8th Cir. 2003) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1987)). Despite this clear law, the Carmodys rely on their positions as "Special Prosecutors"—and nothing more—to support their request for immunity. But the Carmodys cannot receive immunity by virtue of their title alone, because courts do not shield prosecutors from liability based on "an exaggerated esteem for those who perform these functions." *Malley*, 475 U.S. at 342. Rather, the Carmodys must meet their "burden of showing that such immunity is justified for the function in question." *Anderson*, 327 F.3d at 768 (quoting *Burns v. Reed,* 500 U.S. 478, 486 (1991)). Prosecutors are only entitled to absolute immunity for conduct that is

39

"'intimately associated with the judicial phase of the criminal process,' as opposed to investigative 'police work' or administrative duties . . . ." *Myers v. Morris*, 810 F.2d 1437, 1445 (8th Cir. 1987) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)), *abrogated on other grounds by Burns*, 500 U.S. at 478.

None of the Carmodys can meet the burden of establishing that their conduct relates only to the "advocate's preparation for the initiation of prosecution or for judicial proceedings." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). The Complaint alleges that Defendant Gerard Carmody requested an improper search warrant. *See* Compl. ¶¶ 85-86. A prosecutor is not immune from liability for such conduct because "[e]ven when the person who makes the constitutionally required 'Oath or affirmation' is a lawyer, the only function that she performs in giving sworn testimony is that of a witness." *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997). As courts have consistently held since *Kalina*, absolute immunity is available only "as long as a prosecutor does not personally attest to the truth of the evidence presented to a judicial officer, or exercise judgment going to the truth or falsity of evidence." *Spivey v. Robertson*, 197 F.3d 772, 776 (5th Cir. 1999); *accord Cruz v. Kauai County*, 279 F.3d 1064, 1067 (9th Cir. 2002) (prosecutor who swore to facts in bail revocation motion "lost [the] protection [of absolute] immunity because he stepped outside of his prosecutorial role, and into the role of witness, when he personally attested to the truth of facts in the affidavit").

Similarly, the Complaint alleges that Defendants Ryann Carmody and Patrick Carmody were present for the execution of the search warrant. Compl. ¶ 92. "[I]f a prosecutor plans and executes a raid on a suspected weapons cache, he has no greater claim to complete immunity than activities of police officers allegedly acting under his direction." *Buckley*, 509 U.S. at 274 (internal quotation marks omitted). By personally executing the search warrant, Ryann and

40

Patrick Carmody stepped outside the "core" functions of a prosecutor and into the role of a police officer, for which there can be no absolute immunity.

## V.   DEFENDANT LANE'S AND THE SLPOA DEFENDANTS' MOTIONS TO STRIKE SHOULD BE DENIED

Lane and the SLPOA Defendants each also moved to strike the Complaint in its entirety or certain allegations in the Complaint, arguing that the Complaint makes inflammatory, "immaterial[,] and impertinent" allegations. *See* Lane Mem. in Supp. of Mot. To Strike at 3; SLPOA Mem. at 9-10. Neither of these motions has any merit.

Federal Rule of Civil Procedure 12(f) gives courts discretion to strike from a pleading only "redundant, immaterial, impertinent, or scandalous matter." Because "striking a party's pleadings is an extreme measure," motions to strike are "viewed with disfavor" and rarely granted. *Stanbury Law Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir. 2000) (internal quotes omitted). In ruling on motions to strike, courts "view[] the pleadings in the light most favorable to the pleader." *Sperano v. Zeus Tech., Inc.*, No. 4:12 Civ. 578 (JAR), 2012 WL 2117872, at *2 (E.D. Mo. June 11, 2012).

With regard to the SLPOA Defendants' motion to strike, which argues that the Complaint alleges only "personal grudges" with no relation to a valid claim against the Defendants, SLPOA's Mem. at 9, the discussion above demonstrates that that is wrong. Meanwhile, the paragraphs Lane takes issue with fall into two categories: (1) allegations that provide context about the history of the Ku Klux Klan Act and the history of racial discrimination in St. Louis, *see* Comp. ¶¶ 2-11, 22-32; and (2) allegations about conduct by defendants other than Lane, *see id.* ¶¶ 33-99, 101-05. But all of these allegations are material.

The first category of allegations "provides important context and background" for the lawsuit. *Stanbury*, 221 F.3d at 1063. Defendants would not be engaged in this conspiracy but for

41

the fact that Gardner is working to change the racially discriminatory status quo that the Amended Complaint describes. These allegations are thus plainly relevant. *See id.*

The second category of allegations, relating to conduct by other Defendants, is obviously relevant to Gardner's Section 1985 claim in Count I. A conspiracy under Section 1985 necessarily involves conduct by multiple parties. *See* 42 U.S.C. § 1985(3) (requiring involvement of "two or more persons" for a claim under the statute). Thus, allegations about conduct by different defendants are not only relevant to a Section 1985 claim—they are necessary. *Cf. Schwend v. US Bank, N.A.*, No. 4:10 Civ. 1590, 2011 WL 108720, at *1 (E.D. Mo. Jan. 12, 2011) ("Courts have defined allegations or defenses as 'impertinent' when they do not pertain to, and are not necessary to the issues in question." (internal quotes omitted)). Lane's motion to strike allegations concerning actions or conduct by other Defendants in support of claims made against those Defendants makes no sense. Lane's motion should be denied.

## CONCLUSION

The Court should deny all of the Defendants' Motions to Dismiss, as well as Lane's and the SLPOA Defendants' Motions to Strike, in their entirety.

Dated:  April 17, 2020

Respectfully submitted,

_____

Roy L. Austin, Jr.*
Stephen W. Miller*
**Harris, Wiltshire & Grannis LLP**
1919 M Street, NW
The Eighth Floor
Washington, DC 20036
Phone: (202) 730-1300
Fax: (202) 730-1301
raustin@hwglaw.com
smiller@hwglaw.com


_____

Jonathan S. Abady*
Matthew D. Brinckerhoff*
Andrew K. Jondahl**
**Emery Celli Brinckerhoff & Abady LLP**
600 Fifth Avenue, 10th Floor
New York, NY 10020
Phone: (212) 763-5000
Fax: (212) 763-5001
jabady@ecbalaw.com
mbrinckerhoff@ecbalaw.com
ajondahl@ecbawlaw.com


_____

Thomas E. Kennedy, III (Bar No. 46617 MO)
Sarah Jane Hunt (Bar No. 63899 MO)
MaryAnne Quill (Bar No. 71133 MO)
**KENNEDY HUNT, PC**
906 Olive St., Suite 200
St. Louis, MO 63101
Phone: (314) 872-9041
Fax:     (314) 872-9043
tkennedy@kennedyhuntlaw.com
sarahjane@kennedyhuntlaw.com
mquill@kennedyhuntlaw.com

*ATTORNEYS FOR PLAINTIFF*

*Admitted *pro hac vice*
***Pro hac vice* application forthcoming

43

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2020, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following attorneys of record:

Brent Dulle
Andrew D. Wheaton
Associate City Counselors
1200 Market Street, Room 314
St. Louis, Missouri 63103
314-622-4644
DulleB@stlouis-mo.gov
WheatonA@stlouis-mo.gov

ATTORNEYS FOR DEFENDANTS CITY AND GERARD, PATRICK, AND RYANN CARMONDY

Neil J. Bruntrager                          Brian Milliken
Bruntrager & Billings, PC                   Millikan Wright, LLC
225 S. Meramec Ave., Suite 1200             12180 Old Big Bend Road
St. Louis, Missouri 63105                   St. Louis, MO 63122
314-646-0066                                314-621-0622
njbatty@aol.com                             bmillikan@millikanwright.com

ATTORNEYS FOR DEFENDANTS ROORDA AND SLPOA

Elkin Kistner                               Paul Martin
Bick & Kistner, PC                          Paul Martin, PC
101 South Hanley Road, Suite 1280           101 S. Hanley Road, Suite 1280
St. Louis, Missouri 63105                   St. Louis, Missouri 63105
314-571-6823                                314-805-8800
elkinkis@bick-kistner.com                   paul@paulmartinpc.com

ATTORNEYS FOR DEFENDANT CHARLES LANE


   _/s/_____
   Matthew D. Brinckerhoff